876 A.2d 916

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ronald TAYLOR, Appellant.**

**No. 367 CAP.**

Supreme Court of Pennsylvania.

Argued March 1, 2004.

Decided June 21, 2005.

John L. Elash, Esq., for Ronald Taylor.

Michael Wayne Streily, Esq., Robert A. Willig, Amy Zapp, Esq., Pittsburgh, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice CASTILLE.

This is a direct appeal from the sentence of death imposed by the Court of Common Pleas of Allegheny County. Appellant's convictions in the instant case stem from his rampage on March 1, 2000, which began with the arson of his apartment building; resulted in the killing of three people and the maiming of two others; and culminated in a standoff with police at a medical care facility.

Appellant was arrested and charged in connection with his crimes, and he was initially adjudicated incompetent to stand trial by order of the Honorable Jeffrey A. Manning, Jr., dated April 25, 2000. The order directed that appellant be committed to Mayview State Hospital for treatment and evaluation and that he be appropriately medicated until becoming competent.[1]

On June 28, 2000, the Commonwealth petitioned the court to permit its psychiatric expert, Dr. Michael Welner, to have access to appellant's Mayview medical records and also to have access and opportunity to interview appellant and any

1. The order also directed that Mayview Hospital submit to the court, every 30 days, a written report "outlining [appellant's] treatment and evaluating his competency to understand and participate in the legal proceedings." Order of Court, 4/25/00.

Mayview professional or para-professional staff. The trial court granted that motion on June 30, 2000, and in the following days, Dr. Welner interviewed a variety of medical personnel from both Mayview Hospital and St. Francis Hospital, where appellant had received medical treatment from 1990 to 1999. In addition, Dr. Welner reviewed appellant's medical records from Mayview Hospital and interviewed appellant on July 4, 2000. In a letter to the trial court dated July 6, 2000, Dr. Welner informed the court, in detail, that in his opinion appellant was competent to stand to trial. On July 28, 2000, the trial court issued an order directing the Department of Corrections and Mayview Hospital to produce appellant for trial.[2]

The matter was transferred to the Honorable Lawrence J. O'Toole, and present counsel, John Elash, Esq., was appointed in November of 2000 to represent appellant at trial. Public Defender Lisa Middleman, Esq., assisted in appellant's representation. On April 19, 2001, counsel filed a Notice of Intent to Pursue an Insanity Defense. On May 7, 2001, the trial court granted the Commonwealth's petition to allow Dr. Welner access to appellant in order to conduct a psychiatric evaluation regarding appellant's state of mind at the time of the crime.

Dr. Welner attempted to interview appellant on May 19 and 20, 2001, but appellant refused to cooperate. Consequently, on May 21, 2001, the Commonwealth filed a motion with the trial court ordering appellant to cooperate with the interviewing process, in which the Commonwealth requested that the court "conduct a colloquy with [appellant] to advise him to cooperate and participate in the interviewing process in a meaningful manner," and that the court "advise [appellant] that his failure to cooperate in a meaningful manner will result in excluding evidence of any mental infirmity defense or mitigation at any stage of these proceedings." Common-

2. Although the Commonwealth asserts that appellant was adjudicated competent to stand trial on July 28, 2000, the trial court's order did not include any competency finding. In any event, there is no dispute as to appellant's ultimate competence to stand trial. *See* N.T., 5/21/01, at 11.

wealth Motion, 5/21/01, at ¶¶ 6–7. The trial court held a hearing on that same date, at which the court heard testimony from Dr. Welner, who stated that although appellant's medical history records were available for review, it was necessary for him to interview appellant in order to form an opinion on his mental status at the time of the crime. Following the testimony, the court issued an order directing that appellant cooperate with the interview process.

On the morning of May 22, 2001, Dr. Welner interviewed appellant for several hours, but appellant refused to continue the interview session in the afternoon. At a hearing held that afternoon, Dr. Welner testified that he needed approximately 15 hours of total interview time and still needed a "considerable amount of time" with appellant. N.T., 5/22/01, at 5, 8. The court directed the interview process to continue that evening and the next day if necessary.

During the afternoon of the next day, May 23, the court held yet another hearing, at which the Commonwealth complained that appellant had refused to cooperate on the evening prior and had been only "superficially cooperative" that morning, providing answers such as "[n]o comment," and "[t]hat's a stupid question." N.T., 5/23/01, at 20. Defense counsel countered that appellant, in fact, had been complying with the court's order. After hearing testimony from Dr. Welner in support of the Commonwealth's position, the court conducted a record colloquy of appellant to ensure that he understood his duty to comply in order to be able to pursue an insanity defense. Appellant evidenced his understanding, and the court thereafter permitted Dr. Welner to continue the interview process.

On May 24, 2001, the court held another hearing, making record note of the fact that Dr. Welner had ceased the interview process at around 5 p.m. on May 23, and that the Commonwealth sought additional interview time for May 25. The court again agreed to oversee the interview process, but defense counsel informed the court that he would instruct appellant not to answer any further questions. At a hearing on the following morning, May 25, 2001, defense counsel

reiterated his position that appellant had been cooperative up to that point and that he would instruct appellant not to answer any further questions. Later that same day, the court issued an order, in which it noted that it had compelled appellant to participate in a psychiatric examination; that Dr. Welner had, in fact, examined appellant for a total of six to eight hours; and that appellant had substantially complied with the examination process. Thus, the order denied the Commonwealth's request to bar appellant from raising the defense of insanity.

On May 31, 2001, the court issued an order directing that all proceedings in the matter be stayed pending disposition of the Commonwealth's request for permission to appeal the trial court's order. Thereafter, the Superior Court denied the Commonwealth's Petition for Permission to Appeal on August 8, 2001, and this Court denied a Petition for Permission to Appeal on October 4, 2001.

Appellant's trial commenced on November 1, 2001 and the jury convicted appellant of, *inter alia*, three counts of first-degree murder, 18 Pa.C.S. § 2502(a).[3] On November 11, 2001, after a penalty phase hearing at which appellant continued to be represented by Attorneys Elash and Middleman, the jury found one aggravating circumstance as to each murder, and one or more jurors found the existence of one mitigating circumstance as to each murder.[4] The jury unanimously

---

**3.** Appellant was also convicted of the following crimes: eight counts of aggravated assault, 18 Pa.C.S. § 2702; one count of arson, 18 Pa.C.S. § 3301(a)(1); one count each of causing a catastrophe and risking a catastrophe, 18 Pa.C.S. § 3302(a) and (b); one count of ethnic intimidation, 18 Pa.C.S. § 2710; one count of violating the Uniform Firearms Act, 18 Pa.C.S. § 6106; four counts of terroristic threats, 18 Pa.C.S. § 2706; three counts of unlawful restraint, 18 Pa.C.S. § 2902; four counts of simple assault, 18 Pa.C.S. § 2701; and sixteen counts of recklessly endangering another person, 18 Pa.C.S. § 2705.

**4.** The aggravating circumstance found by the jury was that appellant was convicted of another murder that was committed before or at the time of the murder in question. 42 Pa.C.S. § 9711(d)(11). The mitigating circumstance found by the jury was the "catchall" mitigator. 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.").

concluded that the aggravating factors outweighed the mitigating factors, and accordingly, returned three sentences of death. On January 11, 2002, the trial court formally imposed the sentences of death and also imposed an aggregate, consecutive sentence of 115 to 230 years of imprisonment on the remaining convictions. Notice of automatic appeal was filed on February 8, 2002.

Pursuant to the trial court's order, appellant filed a Statement of Matters Complained of on Appeal. On January 23, 2003, the trial court filed an opinion addressing the claims raised by appellant on appeal.

## I. Sufficiency of the Evidence

We turn first, as we do in all capital direct appeals, to our review of the evidence to ensure that it is sufficient to support appellant's convictions for first-degree murder. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We do so notwithstanding that appellant does not challenge the sufficiency of the evidence. *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003). When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences drawn therefrom when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish each element of the offense beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000). A person is guilty of first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body.

*Commonwealth v. Fletcher,* 561 Pa. 266, 750 A.2d 261, 267 (2000).

The evidence adduced at trial established the following. On March 1, 2000, two white maintenance workers, John Kroll and John DeWitt, were replacing the door to appellant's apartment in a building located at 1208 Wood Street, Wilkinsburg, which is in Allegheny County, Pennsylvania. Appellant, who is black, grew angry because he thought that Kroll and DeWitt were taking too long. Appellant called DeWitt a "racist white pig" and "dirty white trash," and DeWitt replied by stating that people like appellant are the cause of racial tension. N.T., 11/1/01, at 88. As DeWitt kneeled, picking up his tools from the floor in the hallway outside appellant's apartment, appellant stood directly over him. Because appellant looked angry, DeWitt rose to his feet with a hammer held at his side. Appellant asked: "You think you're pretty tough?" Appellant walked away but then returned and stated to DeWitt, "You're a dead man ... You have to come back to this building ... You're a dead man." N.T., 11/1/01, at 91–92. DeWitt and Kroll then went to the apartment building's basement, at which point DeWitt left Kroll to attend to another resident's maintenance request. Kroll remained in the basement with another maintenance worker, Andrew Williams, who is black.

Following the confrontation with DeWitt, appellant returned to his apartment, where he retrieved a .22 caliber revolver and placed it in a small pouch along with numerous loose rounds of ammunition. Appellant then set his couch on fire with lighter fluid and exited the apartment, leaving the door open. The fire spread to the ceiling and into the hallway, but firefighters were able to subdue the blaze. No one was injured as a result.

Immediately after setting his couch on fire, appellant began to search the apartment building for DeWitt. When appellant came upon Kroll and Williams in the basement, appellant shouted, "Where are you, mother fucker, I'm going to get you. I got something for you." N.T., 11/1/01, at 112. Williams noticed the brown pouch in appellant's hand, and both

Williams and Kroll pleaded with appellant not to do anything rash. Appellant then pulled the pistol from his pouch, repeating the threat, "I got something for you," and began looking in the boiler room, where he apparently expected to find DeWitt. N.T., 11/1/01, at 114. Unsuccessful in locating DeWitt, appellant exited the building, with Kroll and Williams following and pleading with appellant not to do anything rash. Appellant stopped, turned, and fired one shot into Kroll's chest, killing him and leaving Williams unharmed.[5]

Appellant then walked to a nearby Burger King restaurant. He entered the restaurant, walked past the counter, turned, and walked over to where Joseph Healy, a 71–year–old white male, was sitting in a booth. Without a word, appellant shot Healy at point-blank range in the back of the head, killing him.[6]

Appellant then left the Burger King, and began walking a short distance toward the entrance to a nearby McDonald's restaurant. Richard Clinger, a white male, was sitting in the driver's seat of his van, which was parked in the McDonald's lot. Appellant approached the van, pointed his gun through the partially opened driver side window, and shot Clinger in the head. Appellant then entered the McDonald's and walked behind the counter into the food preparation area. There he found the store manager, Stephen Bostard, another white male. Appellant placed his revolver to Bostard's temple and shot him next to his right ear. Both Clinger and Bostard survived but were severely injured as a result of their wounds.[7]

5. The bullet passed through Kroll's right lung and lodged in his back. The wound bled profusely, causing blood to collect in Kroll's pleural cavity and sending him into a state of shock, which resulted in his death.

6. The gunshot wound that killed Healy revealed that the tip of appellant's gun was either in contact or nearly in contact with the right side of Healy's head, behind his right ear. The bullet went into Healy's brain and transected his brain stem, resulting in his death.

7. Mr. Clinger is now paralyzed on the right side of his body. Mr. Bostard suffered a shattered jaw, a severed vocal cord, and a permanent loss of hearing; and the bullet that struck him remains lodged in the back of his neck.

Next, appellant exited the McDonald's and walked along the line of cars that sat idling in the drive-thru line, peering into some of the cars. Appellant peered into Emil Sanielevici's car through the passenger side window and then began to walk away. Sanielevici lowered the window and inquired what appellant wanted. Appellant responded: "What do I want? What do I want?" and then walked to the driver's side of Sanielevici's car. N.T., 11/2/01, at 249. From less than two feet away, appellant shot Sanielevici in his forehead, killing him.[8]

Thereafter, appellant walked to a nearby apartment building located at 416 Ross Street, and began walking up the entrance stairs. While on the stairs, appellant encountered a tenant of the building, Ronald Washington, who is black. Appellant instructed Washington to "come here," but Washington refused when he noticed the gun in appellant's hand. Appellant assured him that, "this isn't for you . . . it was for these crackers." N.T., 11/5/01, at 379–80. After reloading his gun on the stairs, appellant made his way into the apartment of Christine McCrae, a black woman, who lived on the ground floor and had left her back door open. Appellant instructed McCrae to be quiet and assured her that he would only remain for a few minutes while he collected himself. McCrae later testified that appellant "just said he was just out to get white people." N.T., 11/2/01, at 287. Appellant asked McCrae if she had any guns or a car, and she replied that she did not. Appellant then asked McCrae if any white people lived in the building, to which McCrae replied that she did not know. Appellant kissed McCrae on the forehead and left the apartment.

In response to a police radio call, Wilkinsburg Police Officers Daniel Ciuffe and Michael Mincin were driving in a marked police cruiser through Wilkinsburg in search of the shooting suspect, when they saw appellant crossing the street. Not yet realizing that appellant was their suspect, the officers stopped the car to let him pass, at which point he turned and

---

8. The bullet passed through Sanielevici's right cerebral hemisphere and lodged in the back of his head.

fired three shots in the direction of their patrol car. Appellant then fled into the nearby Penn West Building, where he walked into the offices of the Metro Family medical practice.

Appellant encountered Patricia Papenmeir, a white female receptionist, whom he instructed to "shh." N.T., 11/5/01, at 405. He inquired whether anyone else was in the office, and Papenmeir informed him that another woman was in the file room. Appellant grabbed Papenmeir and led her to the file room, where they found Debbie Nicomede, another white female employee. At some point, Joyce Ambrose, a white nurse at Metro Family, came upon the three and asked if appellant needed help. Looking at Bill Simmington, a black male employee who was nearby, appellant stated, "She doesn't know what time it is." N.T., 11/2/01, at 306. Appellant then led Papenmeir, Nicomede, and Ambrose down the hall at gunpoint, leaving behind Simmington and another black employee. Somewhere down the hallway, appellant announced to the three women: "You don't know how many people I've killed. I just killed five people. I have one bullet left and I'm going to use it on one of you. I just don't know which one it will be." N.T., 11/2/01, at 308. Appellant then waved the gun from one woman to the next, pointing it at their faces and foreheads. When Barbara Pippins, a black female employee of Metro family, inadvertently walked into the hallway where appellant and the three women stood, appellant told Pippins, "You're okay sister. Get out of here." N.T., 11/5/01, at 414. Then, seemingly having decided to shoot Ms. Nicomede, appellant pointed the gun at her head and said, "You look like a smart white bitch." However, he then lowered the gun, grabbed Nicomede by the arm and said, "No, I think I'll terrorize you for a while. Come on." N.T., 11/2/01, at 311. Nicomede pleaded with appellant, who then dropped her arm and walked into an examination room, where appellant aimed his gun at Dr. David Freeman, who retreated to another room. While appellant was looking for Dr. Freeman, everyone in the hallway was able to escape.

Police Officer Paul Tomko, who had responded to the scene from a nearby township, confronted appellant inside the Penn

West Building while the officer was attempting to evacuate the building's occupants. A stand-off ensued, in which appellant pointed his gun at the police and at himself intermittently. Appellant repeatedly inquired how many people had died that day and talked about racism and God. During the following hours, Police Sergeant John Fisher, a negotiations specialist, talked with appellant. When asked about what happened that day, appellant, apparently referring to Mr. DeWitt, responded: "[T]hat God-damned J.D. .... He pushed me too far today. He went ... overboard. I couldn't take it anymore ... that white mother fucker." Appellant later admitted to setting his apartment on fire and told Sergeant Fisher: "You tell J.D. that he's lucky that I didn't get him today. He's lucky he got away." N.T., 11/5/01, at 435, 444.

Appellant eventually surrendered and was immediately transported to the police station, where a large media presence had gathered. Before walking past the media, one officer asked appellant whether he wanted anything to cover his face, to which appellant responded: "I'm proud of what I did. I don't need anything to cover my face." N.T., 11/5/01, at 527–28. Appellant also commented that he should have killed himself because he did not want to spend the rest of his life in jail.

The foregoing evidence was amply sufficient to permit the jury to conclude, beyond a reasonable doubt, that appellant intentionally, deliberately, and with premeditation killed Mr. Kroll, Mr. Healy, and Mr. Sanielevici. Each of these victims was unlawfully killed; appellant committed the killings; and the mere fact that appellant shot Kroll in the chest and Healy and Sanielevici in the head was sufficient to permit the jury to find a specific intent to kill. Additional evidence of appellant's specific intent to kill included the statements he made, indicating, among other things, his dislike for white people, during the course of his rampage.

We now turn to the claims raised by appellant, one of which arises from the guilt phase of the trial and the remaining three of which arise from the penalty phase. We will discuss the claims in order.

## II. Guilt Phase

■ Appellant's sole guilt-phase claim is that the trial court erred by denying his request to charge the jury on diminished capacity and third-degree murder when, in appellant's view, the evidence adduced at trial "clearly challenged [appellant's] capacity to possess the requisite *mens rea* for first-degree murder." Appellant urges that although he knew the difference between right and wrong and was competent to stand trial, he had a diminished capacity "to understand and process information, to communicate, to abstract from mistakes, to learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reaction[s]." In support of this argument, appellant cites to his psychiatric expert's "voluminous psychiatric testimony explaining appellant's psychoses and mental diseases." Appellant posits that, had the jury been instructed as to diminished capacity, they would have considered that appellant was "a psychotic man who manifested his paranoid schizophrenia through a lifetime of bizarre rituals and practices that culminated on March 1, 2000." Appellant concludes that his psychiatric evidence "would have served to negate the element of specific intent and ... resulted in a verdict of Third–Degree Murder." Appellant's Brief at 12–13.

The Commonwealth counters that neither instruction was required and that the defense of diminished capacity was unavailable to appellant in light of the evidence, presented by the Commonwealth and confirmed by appellant's own psychiatric expert, that appellant was capable of forming the specific intent to kill. The trial court, in its Pa.R.A.P.1925(a) opinion, concluded that "[s]ufficient evidence was not presented at trial that would have provided a rational basis for the Court to instruct the jury on either third-degree murder or diminished capacity."

■■ It is settled that "a trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." *Commonwealth v. White*, 490 Pa. 179, 415 A.2d 399, 400 (1980). Rather, there "must be some relation-

ship between the evidence presented and the law upon which an instruction is requested." *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 407 (1994). The reason for this rule is that, "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *White*, 415 A.2d at 400. Accordingly, a criminal defendant must establish that the trial evidence would "reasonably support" a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented during trial. *Commonwealth v. Carter*, 502 Pa. 433, 466 A.2d 1328, 1332–33 (1983).

Furthermore, specific intent to kill is what distinguishes first-degree murder from other lesser types of murder. *See Commonwealth v. Fletcher*, 861 A.2d 898, 907 (Pa. 2004). A non-felony murder committed with malice, but without specific intent, constitutes a third-degree murder. *See Commonwealth v. Meadows*, 567 Pa. 344, 787 A.2d 312, 317 (2001).

This Court first recognized the viability of diminished capacity as a defense to first-degree murder in *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976). There, the defense conceded that the defendant had committed the killing but attempted to offer into evidence testimony from both the defendant and a psychiatric expert that would tend to show that, due to a previous brain surgery, a frontal lobotomy, the defendant did not possess the mental capacity to form the specific intent to kill at the time of the crime. The trial court refused to permit such testimony, and the defendant was convicted of first-degree murder and sentenced to life imprisonment. On appeal, this Court concluded that the defense of diminished capacity is cognizable in Pennsylvania and reversed the trial court's decision to exclude the proffered psychiatric evidence. Noting that the Commonwealth must prove each element of a crime beyond a reasonable doubt, including specific intent to kill in the case of first-degree murder, the Court reasoned that expert testimony concerning the defendant's mental capacity to form specific intent "obvi-

ously would have 'significantly advanced the inquiry' as to the presence or absence of an essential element of the crime." *Id.* at 918 (quoting *Commonwealth v. Hickman*, 453 Pa. 427, 309 A.2d 564, 567 (1973)). Moreover, the Court rejected the argument that policy reasons should bar the use of the defense and held accordingly that the psychiatric evidence in question was relevant as it bore upon an element of the offense charged and should have been admitted. *Walzack*, 360 A.2d at 921.

While the diminished capacity doctrine has not changed significantly since *Walzack* and is now well-recognized as a permissible defense to first-degree murder in an appropriate case, this Court has admonished that the defense is an extremely limited one. *See Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 359 n. 10 (1995). Diminished capacity is directed exclusively at the negation of specific intent, and therefore, to be admissible, evidence of the defense must necessarily put into question the criminal defendant's very ability to form the intent to kill. *See Walzack*, 360 A.2d at 916 n. 6 ("the thrust of the doctrine relates to the accused's ability to perform a specified cognitive process.").[9] Accordingly, we have repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions—by virtue of an "irresistible impulse," a "compulsion," or otherwise-is relevant to negate specific intent, and we have consistently held that such evidence may not be admitted in support of a diminished capacity defense. *See Travaglia*, 661 A.2d at 360 (diminished capacity defense could not be supported by argument that defendant could not control his actions); *Zettlemoyer*, 454 A.2d at 949 (where entire defense was "infested" with language of "irresistible impulse," trial court was correct to inform jury that such language did not bear upon diminished capacity defense; and commenting in dicta that trial court would not have been in error to deny charge on diminished

9. Furthermore, the *Walzack* Court expressly noted at the outset that its holding was not to be read as "inferentially accepting the irresistible impulse test which [the Court had] previously rejected." *Walzack*, 360 A.2d at 916 (citing *Commonwealth v. Myers*, 444 Pa. 465, 282 A.2d 347, 350 (1971)).

capacity altogether); *Commonwealth v. Weinstein,* 499 Pa. 106, 451 A.2d 1344, 1350 (1982) (psychiatric testimony indicating that defendant had compulsion or irresistible impulse to kill is irrelevant to question of specific intent to kill and, therefore, inadmissible).

In the instant case, appellant called Dr. Horacio Fabrega to testify in support of his insanity defense. Dr. Fabrega did not specifically testify to appellants alleged diminished capacity, much less did he offer an opinion that appellant lacked the capacity to form the specific intent to kill. However, certain portions of Dr. Fabrega's testimony are enlightening as to diminished capacity, albeit not in a way that supports appellants argument. For instance, when asked by trial counsel if he had an opinion as to whether appellant was insane at the time of the shootings, Dr. Fabrega launched into an extensive narrative, during which he commented, *inter alia,* that, "essentially [appellant] was, from my formulation, thrown into a psychotic storm of discontrol where he was intending to— where he intended to shoot Mr. DeWitt." When asked later to explain legal insanity, Dr. Fabrega stated, *inter alia,* that, "[o]bviously [appellant] knew what he was doing. [H]e took a loaded gun. He aimed it. He had conversations with people. Later he selectively shot white people and not black people. So there was a deliberateness about that." N.T., 11/6/01, at 607, 609. Still later, Dr. Fabrega noted that, "some of [appellants] behavior was deliberate. [I]t was deliberate in the sense that he didn't shoot women, it was deliberate in the sense that he didn't shoot black people. So he was obviously aware of what was happening." N.T., 6/11/01, at 614.

Following the close of evidence, and prior to the trial courts charging of the jury, defense counsel requested that the court instruct the jury on diminished capacity and third-degree murder. The trial prosecutor responded that there was no evidence to support such jury charges, and that, to the contrary, the testimony from appellants own expert confirmed that appellant had the capacity to form a specific intent to kill. The trial court agreed and did not charge the jury on diminished capacity or third degree murder.

On appeal, appellant simply recites the two charges that he alleges should have been read to the jury but offers little persuasive legal analysis to explain why the evidence that was actually introduced warranted the requested instructions. The fact that appellants defense expert testified that appellant was psychotic and suffered from varying degrees of mental illness does not ineluctably suggest that he lacked the *capacity* to form a specific intent to kill. This Courts independent review reveals that all of the evidence admitted at trial—including evidence proffered by the defense—demonstrated that appellant possessed the capacity to form a specific intent to kill. Moreover, it is worth noting that Dr. Fabrega's opinion that appellant entered into a "psychotic storm of discontrol" harkens back to irresistible impulse, not diminished capacity; this Court has held that such evidence is irrelevant and inadmissible to prove diminished capacity. *See Travaglia*, 661 A.2d at 360. Accordingly, as the evidence did not warrant jury charges for third-degree murder and diminished capacity, the trial court did not err in denying trial counsels request for such charges.

### III. Penalty Phase

Turning to the penalty phase, appellant first claims that the trial court abused its discretion by permitting the Commonwealth's psychiatric expert, Dr. Michael Welner, to testify in rebuttal. Appellant offers two distinct arguments in support of this claim: (1) that Dr. Welner's examination of appellant in May of 2001 provided an insufficient and inadequate basis to support his expert testimony; and (2) that Dr. Welner's testimony violated appellant's right to be free from self-incrimination and his right to counsel under both the Pennsylvania and United States Constitutions.

The background for these arguments is as follows. As noted above, after appellant filed his notice of insanity defense, the Commonwealth was granted leave for Dr. Welner to interview appellant for the purpose of forming an opinion as to appellant's mental state at the time of the crime. Ultimately, the trial court rejected the Commonwealth's request that Dr.

Welner be afforded additional visits with appellant before finalizing his opinion, or in the alternative, that appellant should be barred from raising the defense of insanity. Instead, the trial court agreed with the defense that appellant had substantially complied with the court's previous order to cooperate with the interview process and that he would not be barred from raising an insanity defense. The Commonwealth's attempt to secure appellate review of that decision was denied.

Accordingly, during the penalty hearing appellant presented evidence in support of the following two mitigating circumstances which he ultimately argued to the jury: (1) that he was under extreme mental or emotional disturbance, 42 Pa. C.S. § 9711(e)(2); and (2) that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired, 42 Pa.C.S. § 9711(e)(3).[10] Following the close of appellant's case, the Commonwealth called Dr. Welner in rebuttal to challenge the existence of these mitigators. Appellant objected. Before ruling on the objections, the trial court permitted the prosecutor and defense counsel to examine Dr. Welner outside the presence of the jury in order to ascertain, primarily, whether there was merit to appellant's constitutional claims.

Defense counsel questioned Dr. Welner regarding both his July 2000 competency examination and the sufficiency of his interview time with appellant in May 2001. As to the latter issue, the following exchange took place:

[Defense counsel]: When you testified from that very chair that you could not give an opinion as to the mental state of [appellant] without additional time specifically with [appellant], was that not true?

Dr. Welner: I'd like to see a copy of my testimony so that I could—

[Defense counsel]: Sure.

Dr. Welner: Thank you.

10. No member of the jury found the existence of either of these mental-status mitigators. *See* Jury Verdict Slip.

The Court: Wouldn't that part of his testimony go to its weight in front of the jury? I thought the concern was that there was a possibility that your client's Sixth Amendments [sic] rights had been violated.

[Defense counsel]: That's true.

The Court: The doctor is not—

[Defense counsel]: I'll withdraw that. The court is absolutely correct.

N.T., 11/10/01, at 1082.

Following Dr. Welner's testimony, the trial court overruled defense counsel's remaining constitutional objection and permitted the rebuttal testimony in the presence of the jury. Dr. Welner then testified that, in his expert opinion, appellant was not under extreme mental or emotional disturbance at the time of the crime and that appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was not substantially impaired.

Presently, appellant reverses his earlier position, arguing that, because of the Commonwealth's repeated assertions to the trial court that the amount of time Dr. Welner spent interviewing appellant during the period from May 19 to May 24, 2001 was insufficient to equip the doctor with the information necessary to opine on appellant's mental state at the time of the crime, his testimony should have been excluded. The Commonwealth counters that appellant should not be granted relief upon a claim that he created by his own recalcitrance— *i.e.,* his refusal to cooperate—and that, in any event, the fact that Dr. Welner did not secure as much cooperation from appellant as he would have liked did not preclude him from forming and rendering an opinion, the weight of which was for the jury. The Commonwealth submits that Dr. Welner was able to form a professional diagnosis based upon the amount of time that he actually spent with appellant and the information that was available to him.

We note that, by withdrawing his line of cross-examination—and implicitly, his objection—concerning the amount of time that Dr. Welner spent with appellant, counsel arguably

failed to preserve his present argument. *Freeman*, 573 Pa.
532, 827 A.2d 385.[11] However, the trial court twice stated that
the objection was addressed to the weight of the evidence,
rather than its admissibility, and it is at least arguable that
those comments constituted an overruling of the objection
and/or argument. *See* N.T., 11/10/01, at 1082, 1090. More-
over, the trial court later stated that counsel's "objection as to
Doctor Welner's testifying here as memorialized in [trial coun-
sel's] written and/or oral comments is clearly protected on the
record." N.T., 11/10/01, at 1092. Accordingly, we deem the
argument to be preserved.

 The admissibility of evidence, including rebuttal evi-
dence, is a matter primarily falling within the discretionary
powers of the trial court. *Commonwealth v. Reid*, 571 Pa. 1,
811 A.2d 530 (2002); *Commonwealth v. Jones*, 546 Pa. 161, 683
A.2d 1181 (1996). Contrary to appellant's insistence, the trial
court did not abuse its discretion in deeming Dr. Welner's
testimony to be relevant and admissible rebuttal testimony.
Whatever deficiency inhered in the substance of that testimo-
ny by virtue of appellant's non-cooperation, as the trial court
aptly noted, was a matter for the jury to consider in weighing
the value of the testimony, but it did not affect its admissibili-
ty. *See* N.T., 11/10/01, at 1090; *see also Commonwealth v.
McCrae*, 574 Pa. 594, 832 A.2d 1026, 1035 (2003) (witness's
testimonial inconsistencies created question of weight to be
afforded testimony rather than admissibility); *Commonwealth
v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 277 (2000) (fact that
eyewitness was smoking crack when she observed crime creat-
ed question of weight rather than admissibility). Moreover,

11. Our decision in *Freeman* announced the abrogation of this Court's
 direct capital appeal "relaxed waiver" doctrine, holding that "as a
 general rule on capital direct appeals, claims that were not properly
 raised and preserved in the trial court are waived and unreviewable."
 *Id.* at 402. We further held that the new rule would be applied
 "prospectively, beginning with those capital direct appeals in which the
 appellant's brief has not yet been filed in this Court, and is not due for
 thirty days or more after today's decision." *Id.* at 403. Because
 *Freeman* was filed on May 30, 2003, and appellants brief in the instant
 case was not filed until August 14, 2003, appellant is not entitled to
 application of the former relaxed waiver rule.

appellant cannot profit by his recalcitrance. After his refusal to cooperate further with Dr. Welner, appellant argued that Dr. Welner had sufficient access to appellant such as to render an expert opinion. Although the Commonwealth disputed the point, and unsuccessfully sought interlocutory review, the fact of the matter is that the controlling legal finding by the trial court in the case was that the expert received sufficient access to form an expert opinion. That finding binds appellant now no less than it bound the Commonwealth when it was rendered. Accordingly, appellant's challenge to the admissibility of Dr. Welner's testimony based upon the alleged insufficiency of his examination must fail.

In the alternative, appellant argues that the doctor's testimony was inadmissible because it was based, at least in part, upon information gleaned from appellant during the doctor's competency evaluation in July of 2000, an evaluation which was not preceded by *Miranda*[12] warnings and was conducted without affording appellant the benefit of counsel. Relying on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), appellant reasons that the doctor's testimony violated the Fifth and Sixth Amendments of the United States Constitution.[13] The Commonwealth responds that appellant waived his right to be free from self-incrimination because he raised a mental infirmity defense at trial. Moreover, the Commonwealth argues that the record shows that the entirety of Dr. Welner's penalty phase rebuttal testimony was based upon information and sources independent of his competency examination of appellant. The trial court agreed with the Commonwealth that, "[w]here a defendant has raised a mental-status defense, that defendant does not have a right to raise a Fifth Amendment challenge to an examination by a Commonwealth

12. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

13. Notably, although appellant alleges the violation of his Pennsylvania constitutional rights in his question presented on appeal, he forwards no argument detailing the nature of his state rights, how they were violated, or whether he believes that they differ from his federal constitutional rights. Accordingly, we will deem the rights involved to be coterminous.

psychiatrist." Slip op. at 6 (quoting *Commonwealth v. Morley*, 681 A.2d 1254, 1256 (1996)).

In *Smith*, the defendant was indicted for capital murder in Texas for his participation in an armed robbery of a grocery store during which the store clerk was fatally shot by the defendant's accomplice. Prior to trial, a court-appointed psychiatrist met with the defendant and concluded that he was competent to stand trial, reporting his findings to the court. Thereafter, the defendant was tried and convicted of murder. The case then proceeded to the penalty phase, during which the state called the court-appointed psychiatrist to testify regarding the defendant's future dangerousness which, at the time, was one of three factors required to be proven beyond a reasonable doubt to permit a sentence of death under the Texas death penalty statute. The expert, whose testimony was based entirely upon his pre-trial competency examination, testified that the defendant was a remorseless sociopath who would only get worse and could not be cured or effectively medicated. Following the hearing, the jury found all necessary factors beyond a reasonable doubt and sentenced the defendant to death. On direct appeal, the Texas courts affirmed and the U.S. Supreme Court denied certiorari.

The defendant thereafter filed a petition for a writ of habeas corpus with the federal district court, alleging that introduction of the state's psychiatric testimony violated his Fifth and Sixth Amendment rights. The district court agreed and vacated the death sentence. The Fifth Circuit Court of Appeals affirmed. On appeal, the U.S. Supreme Court concluded that the challenged testimony violated the defendant's Fifth Amendment right against self-incrimination and affirmed, holding that:

> A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because [the defendant] did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of

his statements, the State could not rely on what he said to [the psychiatric expert] to establish his future dangerousness.

451 U.S. at 468, 101 S.Ct. at 1876. The Court continued, hypothesizing that:

If, upon being adequately warned, [the defendant] had indicated that he would not answer [the expert's] questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose. In such circumstances, the proper conduct and use of competency and sanity examinations are not frustrated, but the State must make its case on future dangerousness in some other way.

*Id.* at 468–69, 101 S.Ct. at 1876. The Court emphasized that the Fifth Amendment requires the state to prove its case with evidence other than the results of a court-ordered competency examination where, prior to the examination, the defendant is either uninformed of his Fifth Amendment rights or where he is informed and does not waive them. *Id.* The Court further held that the challenged testimony violated the defendant's Sixth Amendment right to counsel, reasoning that the defendant's choice of whether or not to comply with the competency examination was one that he should not have been forced to make without the "guiding hand of counsel." *Id.* at 471, 101 S.Ct. at 1877 (citation omitted).

Later, in *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), the Supreme Court qualified its holding in *Smith.* In *Buchanan,* the prosecution, over the defendant's Fifth Amendment objection, was permitted to introduce evidence from a pre-trial psychiatric report as it pertained to the defendant's mental state at the time of the crime. Unlike defense counsel in *Smith,* however, Buchanan's attorney had joined in the prosecutor's pretrial request for the evaluation and also had raised a mental infirmity defense— extreme emotional disturbance—at trial. Following the defendant's conviction, the Kentucky Supreme Court affirmed, and on further review, the U.S. Supreme Court affirmed as well, rejecting the defendant's Fifth Amendment claim. The

Court noted that where "a defendant requests [a psychiatric] evaluation or presents psychiatric evidence . . . at the very least, the prosecution may rebut this presentation with evidence from reports of the examination that the defendant requested." *Buchanan,* 483 U.S. at 422–23, 107 S.Ct. at 2917–18. The Court explained the distinction between the circumstances in *Buchanan* and those in *Smith:*

> This case presents one of the situations that we distinguished from the facts in *Smith.* Here [the defendant's] counsel joined in a motion for [the competency psychiatrist's] examination pursuant to the Kentucky procedure for involuntary hospitalization. Moreover, [the defendant's] entire defense strategy was to establish the "mental status" defense of extreme emotional disturbance. Indeed, the *sole* witness for [the defendant] was [the defendant's mental health expert], who was asked by defense counsel to do little more than read to the jury the psychological reports and letter in the custody of Kentucky's Department of Human Services. In such circumstances, with [the defendant] not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence. Accordingly, the Commonwealth asked [the defense expert] to read excerpts of [the competency psychiatrist's] report, in which the psychiatrist had set forth his general observations about the mental state of [the defendant] but had not described *any* statements by [the defendant] dealing with the crimes for which he was charged. The introduction of such a report for this limited purpose does not constitute a Fifth Amendment violation.

*Id.* at 423–24, 107 S.Ct. at 2918 (emphases in original). The Court further concluded that the defendant's Sixth Amendment right to counsel had not been violated, noting that the Sixth Amendment affords criminal defendants the opportunity to consult with counsel, which the defendant undoubtedly had. Recognizing that the effectiveness of such consultation requires that counsel be "informed about the scope and nature of the proceeding," the Court noted that the defendant's counsel unquestionably had such information, especially in

light of *Smith,* which put counsel "on notice that if ... he intended to put on a 'mental status' defense for [the defendant], he would have to anticipate the use of psychological evidence by the prosecution in rebuttal." *Id.* at 425, 107 S.Ct. at 2919.

This Court followed *Buchanan* in *Morley,* 545 Pa. 420, 681 A.2d 1254, which is the cornerstone of the Commonwealth's argument in the instant case. In *Morley,* the defendant pleaded guilty to a general charge of criminal homicide and asserted a diminished capacity defense at the degree of guilt hearing. At the close of the defendant's case, defense counsel joined a motion by the prosecutor to permit the Commonwealth's psychiatric expert to examine the defendant prior to the expert's testifying as to the issue of specific intent. The trial court appointed the Commonwealth's expert to conduct the examination and, following the examination, the expert testified that the defendant was capable of forming the specific intent to kill. The defendant was convicted and sentenced to life imprisonment. On appeal, the defendant challenged the expert testimony as having violated her right against self-incrimination. The Superior Court affirmed, and on further appeal to this Court, we affirmed as well. Consistently with *Buchanan,* we held that "where a defendant ... raises a mental-status defense, ... that defendant does not have a right to raise a Fifth Amendment challenge." *Morley,* 681 A.2d at 1257.[14]

Here, appellant's constitutional objections fail for several reasons. First and foremost, appellant's insistence that Dr. Welner's penalty phase testimony violated his Fifth and Sixth Amendment rights because of what occurred during the competency examination wholly ignores the fact that the record shows that the challenged testimony was not based upon the doctor's competency examination. Dr. Welner testified, outside the presence of the jury prior to penalty phase testimony,

14. This Court also rejected Morley's argument that Article I, Section 9 of the Pennsylvania Constitution afforded her a broader right against self-incrimination than the Fifth Amendment. *Morley,* 681 A.2d at 1258.

that all opinions that he would offer would *not* draw upon any information gleaned in the course of his competency examination. N.T., 11/10/01, at 1074–75. Indeed, when the trial court inquired as to whether Dr. Welner "would be able to address the two issues without discussing anything" ascertained from the competency hearing, Dr. Welner responded: "Absolutely." *Id.* at 1091. There was no abuse of discretion in the trial court's crediting this assurance. Accordingly, the factual predicate for appellant's constitutional claims does not exist.

Furthermore, even accepting appellant's contention that, contrary to the doctor's assurance, the testimony could have been based partially upon the competency evaluation, appellant's constitutional claims would nonetheless fail in light of *Buchanan* and *Morley*. As those cases make clear, appellant waived any Fifth Amendment objection to the introduction of the challenged testimony by virtue of his pursuit of both a mental-status defense at trial-*i.e.,* insanity—and mental—status mitigators during the penalty phase—*i.e.,* extreme mental or emotional disturbance and the inability to appreciate the criminality of his conduct or conform it to the law.[15]

Similarly, appellant's Sixth Amendment claim fails because appellant was represented by counsel at the time of Dr. Welner's competency examination, and thus he was afforded the opportunity to consult with counsel prior to that examination and had an opportunity to raise any pertinent objection. Indeed, it was defense counsel who initiated the inquiry into competency when he requested a psychological evaluation in March of 2000. *See* Motion for Psychological Evaluation, 3/7/2000. The Commonwealth's subsequent motion to permit Dr. Welner to examine appellant and to evalu-

15. We are aware that the *Buchanan* Court highlighted that the evidence at issue there did not contain any incriminating statements made by the defendant, but solely reflected the competency psychiatrist's opinion. *Buchanan,* 483 U.S. at 423–24, 107 S.Ct. at 2918. Notably, this Court's later holding in *Morley* does not cite that factor as essential to the inquiry of whether testimony gleaned from a pre-trial competency examination is constitutionally permissible. *See Morley,* 681 A.2d at 1257. In any event, there is no claim here that Dr. Welner divulged incriminating statements made by appellant.

ate his competency, which was granted on June 30, 2000, was served on his then—counsel. *See* Certificate of Service, 6/28/00. Accordingly, notwithstanding appellant's present insistence to the contrary,[16] counsel was on notice of the examination prior to its occurrence. Thus, similar to the scenario in *Buchanan,* appellant's competency stage counsel knew of the scope and nature of the challenged examination and its potential consequences—*i.e.,* that it might yield incriminating evidence which potentially would be admissible against appellant should he raise a mental infirmity defense at trial—yet raised no objection. Thus, the Sixth Amendment claim fails.

 Appellant's second penalty phase claim is that the trial court abused its discretion by permitting excessive and cumulative victim impact evidence, thereby resulting in an unlawful sentence of death based upon passion, emotion, and prejudice, in violation of 42 Pa.C.S. § 9711(h)(3). Citing to a dissenting viewpoint in this Court's jurisprudence, appellant alleges generally that victim impact testimony amounts to "an impermissible 'arbitrary tiebreaker' and 'super aggravating factor,' ensuring that the jury would find in favor of death." Brief at 30 (quoting *Commonwealth v. Means,* 565 Pa. 309, 773 A.2d 143, 161 (2001) (Zappala, J., dissenting)). More specifically, appellant contends that the Commonwealth's introduction of the testimony of ten witnesses—five concerning one victim; three concerning another; and two concerning the third—was extensive and repetitive and prevented the jury from conducting a rational penalty phase inquiry.

The Commonwealth counters by noting that the Sentencing Code expressly permits the admission of victim impact testimony and that this Court has held that the admission of such testimony does not violate either the Pennsylvania or the United States Constitution. Furthermore, the Commonwealth notes the inevitability that "[t]he more victims there are the more victim impact testimony there will be," and submits that

16. Appellant asserts that "no one bothered to tell [appellant] or his attorneys about the competency examination at all," Appellant's Brief at 22, but points to no evidence supporting that bald allegation, an allegation which is contradicted by the record.

there is no rule against the introduction of more than one impact witness per murder victim. Commonwealth's Brief at 42. Additionally, the Commonwealth counters appellant's challenge to the extensiveness of its victim impact testimony by noting that appellant introduced the testimony of six witnesses during his penalty phase case-in-chief. Finally, the Commonwealth notes that the trial judge read the model instruction, proposed by this Court in *Means,* which advised the jury of how properly to consider victim impact testimony when considering aggravating and mitigating evidence.

In its Rule 1925(a) opinion, the trial court reasoned that "the number of victims in this case necessitated the large number of witnesses" and that, because it read the *Means* instruction verbatim, there is no merit to appellant's challenge to the victim impact testimony. We see no error in the court's ruling.

The Pennsylvania Sentencing Code expressly sets forth that, during the penalty phase of a capital trial, "evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible." 42 Pa.C.S. § 9711(a)(2). The Code further states, in relevant part, that:

> The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family.

42 Pa.C.S. § 9711(c)(2).

In *Means,* the trial court found that Sections 9711(a)(2) and (c)(2) violated the defendant's rights under both the United States and Pennsylvania Constitutions. The Commonwealth appealed to this Court, and we reversed in an Opinion Announcing the Judgment of the Court ("OAJC") authored by Mr. Justice (now Mr. Chief Justice) Cappy. The OAJC began by analyzing the precise nature of the rights involved, noting that although "[t]he basic question concerns the Eighth

Amendment and Article 1, Section 13 [of the Pennsylvania Constitution], . . . the discrete inquiry at bar infuses elements of due process and equal protection into that broader question." *Means*, 773 A.2d at 149. Ultimately, the OAJC found that the statute permitting victim impact testimony did not violate the federal constitution, relying on *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991) ("[I]f the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed."); and similarly, that it did not violate the Pennsylvania Constitution. *Means*, 773 A.2d at 157. Mr. Justice Saylor concurred in the result reached by the OAJC that the Sentencing Code provision permitting victim impact testimony is constitutional, thereby providing the fourth vote upholding the statute, but disagreed with the OAJC's constitutional analysis. *See Means*, 773 A.2d at 160.[17] Moreover, in consideration of the concern raised by the trial court regarding the appropriate manner in which to charge a jury on such evidence, the OAJC articulated a suggested "prototype jury instruction" for victim impact testimony. *Id.* at 158–59.

Although *Means* did not achieve a majority consensus as to why Section 9711(c)(2) is constitutional, a majority of this Court has since consistently rejected challenges, similar to the general claim raised herein, that the statute is unconstitutional. *See Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 446 (2004); *Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1052 (2002); *Commonwealth v. Rice*, 568 Pa. 182, 795 A.2d 340, 352 (2002). Indeed, in *Williams*, this Court rejected the argument, which is implicit in appellant's present position, that this Court should abandon *Means* and adopt a rule disallowing victim impact testimony on the strength of the dissenting opinion in *Means* and the concurring and dissenting

17. Justice Zappala dissented, joined by Chief Justice Flaherty, and Justice Nigro dissented as well. *Means*, 773 A.2d at 160, 162.

opinion in *Rice,* where Justice Zappala employed the same analysis. *Williams,* 854 A.2d at 446. Similarly, in *Harris* we reaffirmed that the statute is constitutional, rejecting due process, equal protection, and cruel and unusual punishment challenges. *Harris,* 817 A.2d at 1053. Moreover, a majority of the Court made clear in *Means* that trial courts have substantial control over the manner in which victim impact testimony is presented to the jury. *See Means,* 773 A.2d at 158; *id.* at 160 (Saylor, J., concurring).

Here, appellant's general allegation attacking victim impact testimony as a "super aggravator" recites an argument that this Court has repeatedly rejected. Thus, his general attack on Section 9711(a)(2) must fail. As to appellant's more specific argument that the evidence in *this* case was so extensive and repetitive as to call the penalty verdicts into question, we note first that the text of Section 9711(a)(2) does not purport to set limits on the amount of allowable victim impact testimony. Furthermore, our decisional law has not purported to fashion a bright-line rule limiting the quantity of victim impact testimony or the number of victim impact witnesses who may testify at a capital sentencing hearing. On the contrary, it is within the sound discretion of the trial court to ascertain the appropriate nature and extent of victim impact evidence which ultimately is placed before a jury. *See Williams,* 854 A.2d at 447. As the Commonwealth aptly notes, where there are multiple victims in a given case, the amount of available and relevant victim impact testimony will likely be commensurately more extensive. Here, appellant does not argue with any specificity why it was that the sheer number of witnesses called, or the nature of their testimony, or the facts of this case prove an abuse of discretion. Instead, he relies primarily on the sheer number of witnesses and the dissent's general concerns in *Means.* We hold that the trial court did not abuse its discretion by permitting the Commonwealth to introduce the challenged testimony, the nature of which was allowed by Section 9711(a)(2) and the extent of which was logically permitted by the circumstances of appellant's multiple crimes.[18]

---

**18.** In his Statement of Matters Complained of on Appeal, appellant also challenged the trial court's jury instruction on victim impact testimony

 Appellant's final contention is that the trial court's imposition of the death sentences in this case is in direct contravention of the Supreme Court's mandate in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that the Eighth Amendment does not permit execution of the mentally retarded. Appellant did not anticipate the *Atkins* decision, and thus he did not raise or preserve an *Atkins* claim below. Appellant nevertheless argues that he adequately demonstrated his mental deficiencies throughout the course of the trial, based upon his showing that he satisfied certain criteria which are mentioned in the *Atkins* opinion as being generally indicative of mental retardation. *See* Appellant's Brief at 32–33.[19] The Commonwealth counters that, based upon the same criteria listed by appellant, the record shows that appellant is not mentally retarded, and that the holding in *Atkins* therefore does not apply to him.

In *Atkins*, the Supreme Court expressly overruled its prior holding in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (Eighth Amendment does not categorically prohibit execution of mentally retarded), and held as follows:

Our independent evaluation of the issue reveals no reason to disagree with the judgment of "the legislatures that have recently addressed the matter" and concluded that death is not a suitable punishment for a mentally retarded criminal. We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a

as "confusing and inadequate." The trial court dismissed that argument, noting that it had read verbatim the charge suggested by this Court in *Means*. Appellant does not pursue this argument on appeal, and therefore, we do not address it further.

19. Appellant categorizes his alleged cognitive and functional limitations according to those criteria listed in the definitions espoused by both the American Association of Mental Retardation (AAMR) and the American Psychiatric Association (APA). *See Atkins*, 536 U.S. at 309 n. 3, 122 S.Ct at 2245 n. 3.

substantive restriction on the State's power to take the life" of a mentally retarded offender.

536 U.S. at 321, 122 S.Ct. at 2252 (citation omitted). The Court did not, however, explicitly adopt a standard national definition for mental retardation, leaving that point to be decided by the individual states.

Recently, in *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 210 (2003), this Court reviewed an *Atkins* claim raised under circumstances where, as here, the defendant was tried and convicted prior to the *Atkins* decision, raised no *Atkins*-type claim below, then filed his direct appellate brief with this Court after the *Atkins* decision and sought its immediate benefit. In *Mitchell,* we noted that both the defendant and the Commonwealth attempted to "muster persuasive arguments by taking [mental health expert] testimony out of the context in which it was presented and rereading it with the hindsight benefit of the holding of *Atkins.*" *Mitchell,* 839 A.2d at 210. Ultimately, this Court decided not to review the *Atkins* claim and not to remand it for a direct appeal evidentiary hearing, explaining as follows:

The issue of mental retardation was touched upon in passing, but it was not the focal point of the testimony of the [mental health expert], nor was it the central focus of either direct or cross-examination. It would be injudicious to reach a legal conclusion on the question of mental retardation based on the current record. To prejudge the merits of [the defendant's] *Atkins* claim based on the limited evidence currently available may create future problems for [the defendant] in raising this issue in the correct forum, as he may then be faced with a determination that the issue was previously litigated.

Nor do we believe that a remand for an evidentiary hearing at this juncture[ ] is the best possible solution for exploring this claim. The claim [the defendant] cannot be executed because after the sentence of death was imposed a constructional ban on the execution of mentally retarded capital defendants was formulated is a claim challenging the authority of the state to carry out the sentence. Direct

review from the judgment of a sentence of death is normally directed at the validity of the legal decisions supporting the conviction or the propriety of the process through with the sentence was achieved. Moreover, this claim will not be lost if review is postponed. If [the defendant] is mentally retarded the judgment of sentence cannot be carried out. Thus, considering the current state of the record and the importance of the claim itself, we find that this claim is best suited to full review in the collateral stage.

*Mitchell*, 839 A.2d at 210–11 (citation omitted).

*Mitchell* is controlling here. As in *Mitchell*, appellant's counsel has diligently attempted to fashion a persuasive *Atkins* argument by taking mental health testimony out of the non-*Atkins* context in which it was presented. But the record was not developed in such a way as to make out an *Atkins* claim. Moreover, the parties' arguments are similarly deficient, as both are focused solely on the issue of whether appellant satisfied the "definition" of mental retardation, apparently proceeding upon the assumption that the criterion plucked from the definitions cited in the *Atkins* opinion are controlling as to that question. That presumption is erroneous, as the *Atkins* Court did not purport to adopt any standard, but rather, as we noted in *Mitchell*, left to the states the task of implementing the restriction banning the execution of the mentally retarded. *See Mitchell*, 839 A.2d at 209.

As was the case in *Mitchell*, it would be injudicious at this juncture for this Court to pass upon the claim, and the more appropriate avenue for review of the claim is upon collateral attack if appellant so desires. Accordingly, this claim is dismissed without prejudice to appellant's right to raise and pursue it upon collateral review under the Post Conviction Relief Act, 42 Pa.C.S. § 9541, *et seq. See Mitchell*, 839 A.2d at 211.

## IV. Statutory Review

Finally, pursuant to our Sentencing Code, this Court is required to conduct a statutory review of the death

sentences and must affirm those sentence unless we determine that:

> (i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or (ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3). The jury unanimously found one statutory aggravating circumstance as to each murder conviction—*i.e.,* that appellant was convicted of another murder committed before or at the time of the murder at issue, 42 Pa.C.S. § 9711(d)(11). *See* Jury Verdict Slip. The evidence amply demonstrated that appellant committed three murders, and he was convicted for each; thus, the evidence clearly was sufficient to support the jury's finding of that aggravator as to each murder. Furthermore, our independent review of the record demonstrates that the jury's sentence of death, which followed upon a consideration of appellant's multiple proffered mitigating circumstances, and then a weighing of the aggravators and mitigators actually found, was not the product of passion, prejudice, or any other arbitrary factor, but rather, resulted from the proper discharge of its sentencing function.

Accordingly, we affirm appellant's convictions and sentences of death and dismiss appellant's claim of death penalty ineligibility based upon mental retardation without prejudice to appellant's right to raise that claim on collateral review under the PCRA.[20]

Chief Justice CAPPY files a concurring opinion in which Messrs. Justice NIGRO and SAYLOR join.

Chief Justice CAPPY, concurring.

I join the result of the majority opinion. Furthermore, I join the analysis that Justice Castille sets forth except for that part of the opinion addressing the admissibility of Dr. Welner's expert testimony. I agree with the majority's statement

---

**20.** The Prothonotary of this Court is directed to transmit a complete record of this case to the Governor of Pennsylvania, pursuant to 42 Pa.C.S. § 9711(i).

of the well-settled principle that the admissibility of evidence, including the admission of rebuttal evidence, is within the sound discretion of the trial court. *See* Majority opinion at 929; *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958, 967 (2001). I distance myself, however, from the remainder of the majority's analysis of this issue.

As mapped out by the majority opinion, this issue arose because during the pre-trial phase the Commonwealth contended, both before the trial court and on appeal, that Appellant should be precluded from offering any evidence of mental infirmity, including the presentation of the insanity defense, because Appellant impeded the interview process with Dr. Welner. Due to this pre-trial argument, Appellant extrapolates that Dr. Welner did not have a sufficient basis for his expert testimony and, thus, argues that the trial court abused its discretion in admitting this testimony at the penalty phase. In essence, Appellant is attacking the sufficiency of the foundation for Dr. Welner's expert testimony.

The majority opinion disposes of Appellant's argument regarding the admissibility of Welner's testimony, attributing any such deficiency in Dr. Welner's testimony as a result of Appellant's "non-cooperation" or "recalcitrance." Majority opinion at 929. The majority apparently adopts the Commonwealth's position that Appellant impeded the interview process concluding that Appellant cannot challenge the admissibility of the evidence. I cannot agree with this reasoning because it contradicts the trial court's order finding that Appellant "substantially complied" with the interview process. Indeed, the majority uses the trial court's order to refute Appellant's argument that Dr. Welner had an insufficient basis for his testimony. The majority cannot have it both ways.

I also am not persuaded by Appellant's arguments because they do not accurately reflect what occurred during the pre-trial litigation of this matter. Contrary to Appellant's implications, the Commonwealth did not represent that Dr. Welner could not testify regarding Appellant's mental state because of the lack of face-to-face interview time, but asserted that Appellant should be precluded from offering any evidence of

mental infirmity because he did not cooperate with the interview process. Thus, the parties are talking apples and oranges, and I would not adopt either party's analysis of this issue.

Rather, I join the result of the majority opinion on this issue simply because the Commonwealth laid an adequate foundation for Dr. Welner's rebuttal testimony at the penalty phase. Specifically, Dr. Welner testified before the trial court, without the jury present that he had reviewed "[a]t least 211" sources of information in preparing his report for the penalty phase, N.T., 11/10/2001, at 1074; and that these sources of information included police reports, interviews with medical personnel, and reports from medical personnel, *id.* at 1081, 1084–85. Furthermore, he stated that he could render an opinion without the aid of the interviews with Appellant. *Id.* at 1074–75. Accordingly, the trial court did not abuse its discretion in admitting this testimony and the weight to be accorded such testimony was for the jury.

Messrs. Justice NIGRO and SAYLOR joins this concurring opinion.