**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOSE ANTONIO CRUZ | : | |
| | : | |
| Appellant | : | No. 2543 EDA 2016 |

Appeal from the PCRA Order July 25, 2016
In the Court of Common Pleas of Lehigh County
Criminal Division at No(s):  CP-39-CR-0003697-2011,
CP-39-CR-0003701-2011

BEFORE:   OTT, J., STABILE, J., and STEVENS*, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED MAY 15, 2018**

Jose Antonio Cruz appeals, *pro se*, from the order entered July 25, 2016, in the Lehigh County Court of Common Pleas, dismissing Cruz's first petition filed pursuant to the Post Conviction Relief Act ("PCRA").[1]  Cruz seeks relief from the judgment of sentence of life imprisonment, and a consecutive term of 27 to 54 years' incarceration, imposed following his jury conviction of first-degree murder, aggravated assault, robbery (five counts), and firearms not to be carried without a license (two counts).[2]  Cruz raises four issues on appeal:  (1)  trial counsel was ineffective for failing to investigate and present

---

* Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S.§§ 9541-9546.

[2] **See** 18 Pa.C.S. §§ 2502(a), 2702, 3701(a)(1)(i) and (ii), and 6106, respectively.

evidence of Cruz's mental illness to negate the element of specific intent; (2) trial counsel was ineffective for failing to call Detective Pedro Cruz to testify regarding statements Cruz made to him; (3) all prior counsel were ineffective for failing to challenge the legality of his sentence; and (4) direct appeal counsel was ineffective for failing to petition the Pennsylvania Supreme Court for allowance of appeal. For the reasons below, we affirm in part, reverse in part, and remand for further proceedings.

The facts underlying Cruz's arrest and convictions were aptly summarized in the decision affirming his judgment of sentence on direct appeal as follows:

In June of 2011, [Cruz] and Elba Lopez, along with their minor children [Footnote 4] resided at 3 Maryland Circle, Apartment # 3, Whitehall, Lehigh County, Pennsylvania. [Cruz] and Ms. Lopez had been in a relationship, off and on, since 2008. Throughout their relationship, [Cruz] had concerns that Ms. Lopez was unfaithful to him. On the morning of June 5, 2011, [Cruz] learned that Ms. Lopez had had a past relationship with one of her coworkers. [Cruz] became upset and meandered throughout Allentown during the day, visiting with family members and consuming alcohol. [Cruz] returned to his home at approximately midnight, but did not see either Ms. Lopez or his minor children in the home.[Footnote 5]

> [Footnote 4] The couple had two children at the time of the instant crimes; Ms. Lopez has since given birth to a third child.

> [Footnote 5] [Cruz] testified that he only noticed that his 12 year old son from a prior relationship was in the apartment, playing video games in the living room area.

In the late evening hours of June 5, 2011, Alexis Lopez was visiting his sister, Elba Lopez, at the apartment she shared with [Cruz]. When Mr. Lopez arrived at the home, Elba and the children were in the apartment, [Cruz] was either not at the home

yet or was unseen by Mr. Lopez. Mr. Lopez stayed for approximately 45 minutes. As he left the apartment, he kissed his sister goodbye and proceeded down the steps outside of the individual apartment.

At this point, [Cruz] had exited the bathroom of the apartment, naked, when he believed that [he] heard Ms. Lopez speaking to and kissing an unknown male. [Cruz] confronted Ms. Lopez and [Cruz] began to physically assault Ms. Lopez.

At this moment, Mr. Lopez was walking down the stairs when he heard an argument and heard his sister scream. He proceeded back up the stairs and encountered his sister running down the steps, carrying the two small children. She told him to run, that [Cruz] had a gun.

[Cruz] emerged from the apartment and fired a gun into the air. He then returned to his apartment to put on clothes.

Meanwhile, Mr. Lopez had taken Ms. Lopez and her children to [Cruz's] mother's house, about 10 minutes away. Mr. Lopez left his sister and the children at that location, while taking [Cruz's] mother and brother back to the apartment at 3 Maryland Circle so that they could speak to [Cruz]. When they arrived back at the apartment, [Cruz] was not there.

On a mission to find Ms. Lopez and/or the unknown male, [Cruz] took Ms. Lopez's silver car to 420 West Oak Street, Allentown, Lehigh County, Pennsylvania, the home of Ms. Lopez's mother, Maria Sepulveda, and her husband, Edwin Jimenez–Gonzalez.

In the early morning hours of June 6, 2011, A[dal]berto Lopez, another brother of Elba Lopez, was at 420 West Oak Street. Mr. Lopez was working in a first floor computer room of the home and Ms. Sepulveda and Mr. Jimenez–Gonzalez were asleep in their bedroom on the second floor. At approximately 1 a.m., [Cruz] arrived at the back door/kitchen door to 420 West Oak Street. Mr. Lopez responded to the door and [Cruz] began to tell Mr. Lopez to let him into the home and asked where Elba Lopez was. Mr. Lopez refused to open the door and told [Cruz] to leave, that Elba Lopez was not there. [Cruz] began to force his way into the home.

Hearing the commotion at the door, Mr. Jimenez–Gonzalez came downstairs, along with Ms. Sepulveda. Mr. Lopez told Mr. Jimenez–Gonzalez not to open the door. Mr. Jimenez–Gonzalez

walked to the back door and told Mr. Lopez that he was just going to talk to [Cruz]. [Cruz] demanded to speak to Elba Lopez. Mr. Jimenez–Gonzalez and Mr. Lopez repeatedly told [Cruz] that Elba Lopez was not there and told him to go home. Again, [Cruz] attempted to enter the residence, forcing his way into the home. At that point, Mr. Jimenez–Gonzalez grabbed [Cruz] and was able to push him to the door.

[Cruz] immediately pulled a silver Magnum handgun out of the pocket of the black hoodie he was wearing, and said, "What's your problem?" to Mr. Jimenez–Gonzalez. Mr. Lopez told [Cruz] to put the gun down and to leave the home. [Cruz] continued to point the gun at Mr. Jimenez–Gonzalez. While inside the home, Mr. Jimenez–Gonzalez tried to grab the gun from [Cruz]. The two began to struggle and the tussle wound its way to the rear patio of the home. A shot rang out, there was a pause, and a second shot rang out. Mr. Jimenez–Gonzalez screamed for someone to call the police, fought to get back inside the house and collapsed on the kitchen floor by the steps leading to the second floor. Ms. Sepulveda went to her husband to comfort him. [Cruz] fled the residence.

[Cruz's] version of the events, as he testified at trial, differs slightly. [He] asserts that after he asked Mr. Jimenez–Gonzalez if Elba Lopez was at the home, a struggle between them ensued. [Cruz] asserts that Mr. Jimenez–Gonzalez struck him in the face and grabbed him by the neck. [Cruz] testified that he told Mr. Jimenez–Gonzalez "to back off" but that he did not. He then testified that Mr. Jimenez–Gonzalez grabbed the gun and as they struggled, a shot went off. [Cruz] was unsure who was hit (although he felt no pain) and a second shot was fired. He admitted that he was the one who pulled the trigger twice during the struggle. He recalled seeing Mr. Jimenez–Gonzalez fall to the kitchen floor and immediately fled the scene because he "just wanted to get away."

An ambulance arrived shortly thereafter and took Mr. Jimenez–Gonzalez to the hospital. The shots Mr. Jimenez–Gonzalez received were fatal. An autopsy was performed and the cause of death was determined to be gunshot wounds of the torso with fractures and visceral injuries. The manner of death was ruled a homicide.

Two .45 caliber shell casings were recovered from 420 West Oak Street and sent for further ballistic testing.

A short time after the alleged shooting, at approximately 1 am on June 6, 2011, Oscar Hernandez was driving his Ford Mustang at the intersection of Union Boulevard and Airport Road, Allentown, Lehigh County, near the Wawa convenience store. As he approached the intersection travelling south on Airport Road, a car from his right side proceeded through a red light and the two vehicles crashed. A witness from a nearby home came to the intersection to make sure that Mr. Hernandez was alright. Mr. Hernandez's vehicle was incapacitated at the scene and the striking vehicle came to a stop in the Wawa parking lot. While on scene, Mr. Hernandez heard gunshots from the direction of the Wawa.

Leandro Perez was also at the Wawa that morning, driving a white Jeep. After pulling up to one of the gas pumps, Mr. Perez exited his vehicle and attempted to open the cap of his gas tank. Immediately, a male approached him with a pointed handgun, demanding the keys to the Jeep. The individual appeared to be in a hurry and Mr. Perez noticed that he was wearing dark clothing and had a stream of blood going down his face. Mr. Perez told the individual that he couldn't give him the keys. The individual repeatedly asked Mr. Perez for the keys, but Mr. Perez refused to give them to him. The individual eventually walked or ran away. This interaction was observed by Jeannie McFarland, manager at the Wawa on that evening.

Ms. McFarland observed the same individual proceed to another car positioned at a different gas pump, where Elionel Diaz–Rivera and his friend, Pedro Leon, were. Mr. Leon was driving a black Cadillac. Mr. Diaz–Rivera and Mr. Leon went inside the Wawa to prepay for gasoline and to use the ATM. They then began to walk back towards the car. Mr. Diaz–Rivera observed an unknown man wearing dark clothing exiting the Cadillac's driver's side door. The man approached Mr. Diaz–Rivera and Mr. Leon and asked them for the car keys. Mr. Diaz Rivera observed a gun at the man's waist. The keys were not turned over to the individual and Mr. Diaz–Rivera and Mr. Leon went back [inside] the Wawa store. Mr. Leon proceeded to hide behind a refrigerator after he overheard another patron say someone had a gun.

Carla Arce and her husband, Samir, were also at the Wawa, attempting [to] get gas for their Honda Accord. Samir, who was driving the vehicle, pulled up to the pump, with his window down and the door slightly ajar. Immediately a man pointed a gun to his head and told him to give him the car keys. Samir told the

- 5 -

man that he would give him anything he wanted, but not to hurt either of the Arces. Ms. Arce remained in the passenger seat. The individual with the gun got into the driver's seat and pointed the gun at Ms. Arce's head. He asked her, "Do you know how to drive this piece of shit?" Ms. Arce told him she did not, as the car has a standard transmission. The individual exited the car and Ms. Arce quickly got out of the car to look for help. Ms. Arce observed the individual go towards another vehicle in the Wawa parking lot and observed the individual leave the Wawa, heading westbound.

Natasha Henn was also at the Wawa. She had parked her purple Dodge Neon in front of the convenience store while the friend she was with went into the store. Ms. Henn noticed that people inside of the Wawa were looking out of the window in her direction. Ms. Henn glanced behind her but didn't see anything. As she started to get out of her car, someone stopped her by grabbing her door. The individual held a gun to her head and told her to get out. She had her keys in her hand, got out of the car and the individual got into the car. She ran into the store, with her keys still in her hand. She was able to notice that the individual was wearing black and had a cut on his face.

Raymond Shook and George Fetter were also at the Wawa that morning. Mr. Fetter was driving his son's black Audi and parked the vehicle in front of the Wawa store. Mr. Fetter exited the vehicle and went inside the Wawa, leaving Mr. Shook in the passenger seat, with the car's engine still on. Mr. Fetter heard an argument outside of the convenience store and turned around to see what was happening. He observed an unknown man getting into his Audi. Mr. Fetter walked back to the car and ran around to the rear of the vehicle. The individual then turned around to face Mr. Fetter, pointed a gun at him, and Mr. Fetter became scared. Mr. Fetter hunched down behind the vehicle and observed the unknown individual struggling with Mr. Shook inside of the car. Mr. Fetter then heard gunshots and Mr. Fetter ran away from the vehicle.

Meanwhile inside of the Audi, Mr. Shook saw Mr. Fetter approach the door of the Wawa, only to find the doors locked. At that moment, an unknown individual entered the Audi, pointed a gun at Mr. Shook's side and said, "Get out." Mr. Shook attempted to exit, but the door would not open. Mr. Shook told the unknown individual to open the doors and pushed the gun away from him. At that point, Mr. Fetter was approaching the vehicle. The individual got out of the car and confronted Mr. Fetter. When the

individual returned, Mr. Shook was attempting to place his feet out of the passenger side window to escape. The individual shot at Mr. Shook, hitting him once through the left side (ribcage), while Mr. Shook was half-way out of the vehicle. After getting shot, Mr. Shook went into the Wawa store and asked for help.[Footnote 6]

[Footnote 6] All of the robbery victims, except for Ms. Arce, were able to positively identify [Cruz] as the individual wielding the weapon and wearing the black hoodie.

It was later determined that the bullet entered the left side of Mr. Shook's rib cage, went underneath his heart, through his liver, bladder, colon, and intestines and became lodged in his leg, where it remains. Mr. Shook spent approximately two and a half months in the hospital and underwent a 10 hour surgery. He had four feet of his large bowel and five feet of his small bowel removed. He still has pain under his rib cage, has difficulty with his stomach and bowels, and suffered a blood clot in his lung. He continues to receive medical care.

Immediately after Mr. Jimenez–Gonzalez was shot, A[dal]berto Lopez called 911. Officers arrived, along with EMS personnel to attend to Mr. Jimenez–Gonzalez. Information was related to the communications center indicating a description of [Cruz] and the vehicle he was driving. Further, the communications center received information regarding the vehicle accident involving Mr. Hernandez's car and from other sources at the Wawa regarding the incidents that took place at the Wawa. Descriptions received and additional information was disseminated via police radio.

At approximately 7:46 a.m. on June 6, 2011, Sergeant Eric Heicklen of the Allentown Police Department observed a vehicle matching the description and license plate information of the Audi stolen from the Wawa at 510 East Moser Street, Allentown, Lehigh County (the Washington Crossing Apartment complex). The Emergency Response Team (ERT) of the Allentown Police Department responded to the location and recovered the vehicle. After the building had been evacuated, [Cruz] was located in Apartment 17 and was taken into custody. At that time, [Cruz] had an abrasion and lumping on his head and he was complaining of back pain.

At approximately 8:30 a.m. on June 6, 2011, Detective Pedro Cruz of the Allentown Police Department went to [Cruz's] home at 3 Maryland Circle, Apartment # 3, Whitehall, and searched the

apartment. As a result, Detective Cruz found a .45 caliber shell casing outside of [Cruz's] apartment building, next to the main door.

Inside of the apartment, Detectives Daniel Gross and William Lake of the Allentown Police Department recovered a key fob with the Audi symbol on it, hidden in the back of a speaker in the apartment's living room. Inside of another speaker, a lanyard with what appeared to be house keys was located. The Audi key was later returned to Mr. Fetter and corresponded with his vehicle. The lanyard with house keys was identified by Mr. Fetter's son as belonging to him.

Detective Mark Boyer of the Allentown Police Department determined that [Cruz] did not have a license to carry a firearm.

Sergeant Kurt Tempinski of the Pennsylvania State Police Forensic Services, and qualified as an expert in toolmark and firearm examination, examined and determined that the bullets recovered from the victim's body were discharged from the same firearm. Further, he determined that bullet casings found at 420 Oak Street and at 3 Maryland Circle were discharged from the same firearm. The firearm was never recovered.

*Commonwealth v. Cruz*, 107 A.3d 232 [92 EDA 2013] (Pa. Super. 2014) (unpublished memorandum at 1-9) (citation omitted).

Subsequently, Cruz was charged at Docket No. 3697-2011 with offenses related to the incident at Lopez's mother's home, including the murder of Jimenez-Gonzalez. He was also charged at Docket No. 3701-2011, with offenses related to the incident at the Wawa, including attempted murder[3] and aggravated assault for the shooting of Shook. Although counsel filed a pretrial notice that he intended to raise a mental infirmity defense, he did not pursue that defense at trial. Cruz's jury trial commenced on July 17, 2012. On July

---

[3] *See* 18 Pa.C.S. § 901.

25, 2012, the jury returned the following verdict: (1) at Docket No. 3697-2011, the jury found Cruz guilty of the charges of first-degree murder and firearms not to be carried without a license; (2) at Docket No. 3701-2011, the jury found Cruz guilty of one count of aggravated assault and firearms not to be carried without a license, and five counts of robbery. Cruz was acquitted of the attempted murder of Shook. On August 29, 2012, the trial court sentenced Cruz to a mandatory term of life imprisonment for the charge of first-degree murder, and a consecutive aggregate term of 27 to 54 years' incarceration for the remaining convictions.[4] That same day, trial counsel was permitted to withdraw, and the court appointed new counsel for appeal.

Due to an administrative error, appellate counsel failed to file a timely direct appeal. Accordingly, in December of 2012, counsel sought leave to appeal *nunc pro tunc*, which the trial court granted. Thereafter, a panel of this Court affirmed Cruz's judgment of sentence on direct appeal. **See Cruz**,

---

[4] At Docket No. 3697-2011, the court imposed a consecutive term of three to six years' imprisonment for the firearms offense. At Docket No. 3701-2011, the court imposed consecutive terms of six to 12 years' imprisonment for three of the robbery charges, and a consecutive term of six to 12 years' imprisonment for the aggravated assault charge; on each of remaining two robbery charges, the court imposed a concurrent term of six to 12 years' imprisonment, as well as a concurrent term of three to six years' imprisonment on the firearms offense. Accordingly, the aggregate sentence imposed consecutively to the life sentence was 27 to 54 years' incarceration.

***supra***.  No petition for allowance of appeal was filed in the Pennsylvania Supreme Court.

On September 24, 2015, Cruz filed this timely PCRA petition.  Counsel was appointed, and on June 24, 2016, filed a motion to withdraw, and a ***Turner***/***Finley***[5] "no merit" letter.  Cruz did not respond specifically to counsel's "no merit" letter, but rather filed several *pro se* motions seeking, *inter alia*, discovery and the recusal of the PCRA judge.  On June 30, 2016, the PCRA court provided Cruz with notice of its intent to dismiss his petition without first conducting an evidentiary hearing, for the reasons outlined in counsel's "no merit" letter.  ***See*** Pa.R.Crim.P. 907.  In the same notice, the Court also granted counsel's motion to withdraw.  On July 19, 2016, Cruz filed a *pro se* response to the court's Rule 907 notice, in which he requested an evidentiary hearing, and asserted PCRA counsel's ineffectiveness.  ***See*** Defendant's Response to Trial Court's 907 Notice of Intent to Dismiss PCRA, 7/19/2016.  The PCRA court entered an order on July 25, 2016, dismissing Cruz's PCRA petition.  Nevertheless, on July 26, 2016, Cruz filed an amended/supplemental PCRA petition, asserting the illegality of his sentence. The court denied the supplemental petition on July 27, 2016, stating it had already denied PCRA relief.   This timely appeal followed.[6]

---

[5] ***See Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988), and ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[6] The PCRA court did not direct Cruz to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

"In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Mitchell**, 141 A.3d 1277, 1283–1284 (Pa. 2016) (internal punctuation and citation omitted). Further, a PCRA court may dismiss a petition "without an evidentiary hearing if there are no genuine issues of material fact and the petitioner is not entitled to relief." **Id.** at 1284 (citations omitted). Where, as here, the defendant alleges counsel rendered ineffective assistance, we note:

> "In order to obtain relief under the PCRA premised upon a claim that counsel was ineffective, a petitioner must establish beyond a preponderance of the evidence that counsel's ineffectiveness 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.'" **Commonwealth v. Payne**, 794 A.2d 902, 905 (Pa. Super. 2002), *quoting* 42 Pa.C.S.A. § 9543(a)(2)(ii). When considering such a claim, courts presume that counsel was effective, and place upon the appellant the burden of proving otherwise. **Id.** at 906. "Counsel cannot be found ineffective for failure to assert a baseless claim." **Id.**
>
> To succeed on a claim that counsel was ineffective, Appellant must demonstrate that: (1) the claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) counsel's ineffectiveness prejudiced him. **Commonwealth v. Allen**, 833 A.2d 800, 802 (Pa. Super. 2003).

**Commonwealth v. Michaud**, 70 A.3d 862, 867 (Pa. Super. 2013). "To demonstrate prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's actions or inactions, the result of the proceeding would have been different." **Commonwealth v. Mason**, 130 A.3d 601, 618 (Pa. 2015).

In his first issue, Cruz contends trial counsel was ineffective for failing to "investigate and introduce Cruz's psychiatric records" to establish Cruz suffered from mental illness, and negate the specific intent to kill required to support his conviction of first-degree murder. Cruz's Brief at 11. In particular, Cruz insists counsel should have called Dr. Frank M. Dattilio to testify. *See id.* at 15. Dr. Dattilio evaluated Cruz in 1994, after a then 14-year-old Cruz accidentally shot and killed his 13-year old brother. *See id.* at 12. Although Cruz was initially arrested and charged as an adult, the shooting was later ruled accidental. *See id.* Cruz maintains the PCRA court erred in failing to conduct an evidentiary hearing on this issue because Dr. Dattilio's psychiatric evaluation, which Cruz attached to his PCRA petition, establish that Cruz suffered from post-traumatic stress disorder ("PTSD"), with "impulsivity" issues, and would require ongoing and consistent treatment. *See id*. at 12-13. He insists this evidence was relevant to his state of mind at the time of present shooting, and may have supported a conviction of a lesser degree of homicide. *See id.* at 14, 16-17.

Preliminarily, we note:

> To prevail on a claim of trial counsel's ineffectiveness for failure to call a witness, an appellant must show: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or should have known of the witness's existence; (4) the witness was prepared to cooperate and would have testified on appellant's behalf; and (5) the absence of the testimony prejudiced appellant.

***Commonwealth v. Cousar***, 154 A.3d 287, 312 (Pa. 2017). Here, trial counsel was, arguably, aware of Dr. Dattilio's existence as a possible witness

- 12 -

because counsel had filed a pretrial motion seeking to obtain Cruz's psychological records. *See* Motion, 2/20/2012. Assuming *arguendo*, Dr. Dattilio was available and willing to testify on Cruz's behalf, we still conclude Cruz is entitled to no relief since he was not prejudiced by the absence of Dr. Dattilio's testimony. Indeed, disregarding the staleness of the diagnosis made 17 years before the crime at issue, we conclude the fact that Cruz may have suffered from PTSD, with impulsivity concerns, would not have supported a defense to the murder of Jimenez-Gonzalez.

With regard to the defense of diminished capacity, the Pennsylvania Supreme Court has explained:

> While the diminished capacity doctrine … is now well-recognized as a permissible defense to first-degree murder in an appropriate case, this Court has admonished that the defense is an extremely limited one. *See Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 359 n. 10 (1995). Diminished capacity is directed exclusively at the negation of specific intent, and therefore, to be admissible, evidence of the defense must necessarily put into question the criminal defendant's very ability to form the intent to kill. *See* [*Commonwealth v.*] *Walzack*, [360 A.2d 914, 916 n.6 (Pa. 1976),] ("the thrust of the doctrine relates to the accused's ability to perform a specified cognitive process."). Accordingly, we have repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions-by virtue of an "irresistible impulse," a "compulsion," or otherwise-is relevant to negate specific intent, and we have consistently held that such evidence may not be admitted in support of a diminished capacity defense. *See Travaglia*, 661 A.2d at 360 (diminished capacity defense could not be supported by argument that defendant could not control his actions); [*Commonwealth v.*] *Zettlemoyer*, 454 A.2d [937,] 949 [(Pa. 1982), *cert. denied*, 461 U.S. 970 (1983),] (where entire defense was "infested" with language of "irresistible impulse," trial court was correct to inform jury that such language did not bear upon diminished capacity defense; and commenting

- 13 -

in dicta that trial court would not have been in error to deny charge on diminished capacity altogether); *Commonwealth v. Weinstein*, [] 451 A.2d 1344, 1350 (1982) (psychiatric testimony indicating that defendant had compulsion or irresistible impulse to kill is irrelevant to question of specific intent to kill and, therefore, inadmissible).

*Commonwealth v. Taylor*, 876 A.2d 916, 926–927 (Pa. 2005) (footnote omitted). Rather, "psychiatric testimony is competent in Pennsylvania on the issue of specific intent to kill if it speaks to mental disorders affecting the **cognitive functions** necessary to formulate a specific intent." *Weinstein*, *supra*, 451 A.2d at 1347 (emphasis supplied). Cruz does not explain how his diagnosis of PTSD or impulsivity issues affected the "cognitive functions" of his brain, nor does our review of Dr. Dattilio's evaluation provide any insight on this issue. *See* Motion for Post Conviction Collateral Relief, 9/24/2015, at Exhibit A, Psychological Evaluation of Cruz. Therefore, Dr. Datillio's testimony and Cruz's psychiatric records would not have been admissible to negate the element of specific intent to kill.

Nevertheless, Cruz also argues the psychiatric evidence would have been relevant to support a charge of voluntary manslaughter pursuant to 18 Pa.C.S. § 2503,[7] in that he either acted under a heat of passion pursuant to

---

[7] Section 2503 provides, in relevant part:

> **(a) General rule.**--A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

subsection (a), or he acted in self-defense, albeit unreasonably, pursuant to subsection (b). **See** Cruz's Brief at 17-23. **See also** 18 Pa.C.S. § 505(b). We disagree.

This Court has recognized that evidence a defendant suffered from PTSD may be relevant in determining whether the defendant acted in self-defense. **See Commonwealth v. Pitts**, 740 A.2d 726, 733-734 (Pa. Super. 1999) ("Psychiatric testimony has long been held admissible to prove a defendant's subjective belief that he or she is in danger of imminent death or serious bodily injury."). However, in the present case, Cruz challenged the trial court's refusal to provide a jury instruction on imperfect self-defense, as set forth in Section 2503(b), in his direct appeal. **See Cruz**, **supra**, 107 A.3d 232 (unpublished memorandum at 14-17). The panel rejected his argument based on Cruz's inability to establish two of the three elements of a justification

---

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

**(b) Unreasonable belief killing justifiable.**--A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S. § 2503(a), (b).

defense, *i.e.*, "that he was free from fault in provoking or continuing the difficulty which culminated in the slaying, and that he did not violate any duty to retreat."[8]  ***Id.*** (unpublished memorandum at 16) (finding Cruz "barged" into Jiminez-Gonzalez's home uninvited, and drew a gun on the unarmed victim).  The psychiatric evidence supporting Cruz's PTSD diagnosis would not have established either of these two missing elements.

Furthermore, with respect to a heat of passion charge, this Court noted on direct appeal that Cruz "concede[d] that heat of passion would not apply where it was not the victim, Jimenez-Gonzalez, who caused [Cruz's] anger." ***Id.*** at 17 n.1.  Again, nothing in Cruz's psychiatric records would change that fact.  Accordingly, because Cruz's PTSD diagnosis was not relevant to any defense he could have established at trial, we find trial counsel was not ineffective for failing to introduce Cruz's psychiatric records at trial.

Next, Cruz argues trial counsel was ineffective for failing to call Detective Pedro Cruz to testify regarding statements Cruz made to him during an

---

[8] ***See Commonwealth v. Ventura***, 975 A.2d 1128, 1143 (Pa. Super. 2009) (holding that when a defendant raises a claim of self-defense, the Commonwealth must disprove the defense by establishing "at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible with complete safety."), ***appeal denied***, 987 A.2d 161 (Pa. 2009).

interview at the hospital following his arrest. *See* Cruz's Brief at 25. Cruz claims he told the detective: (1) "he had been drinking and blacked out;" (2) he could not remember the details of Jimenez-Gonzalez's murder or the subsequent robberies; (3) he loved Jimenez-Gonzalez "like a father;" and (4) he expressed remorse for his actions. *Id.* Cruz insists these statements were relevant to his state of mind. *See id.* He also claims trial counsel colluded with the prosecutor and trial court "to deny his own clients (sic) fundamental rights." *Id.* at 26.

We find Cruz is entitled to no relief because counsel, in fact, did seek to call Detective Cruz to the stand, but the trial court sustained the Commonwealth's objection to his testimony as impermissible hearsay. *See* N.T., 7/20/2012, at 53-58, 70-84. Indeed, the court rejected counsel's claim that Detective Cruz's testimony concerning Cruz's statements was admissible under the state of mind exception. *See id.* at 75. Rather, the court found Cruz's statements to the detective were too remote from the actual incidents (the murder and robberies) to demonstrate his state of mind at the time of the crimes. *See id.* at 80. Accordingly, because counsel did vigorously seek the admissibility of Detective Cruz's testimony, although ultimately unsuccessful, we conclude Cruz cannot establish counsel's ineffective assistance with regard to this claim.[9]

_____

[9] We note, too, that Cruz's present argument concerning the relevancy and significance of his statements to Detective Cruz is difficult to accept

In his third issue, Cruz maintains his sentence is illegal pursuant to ***Alleyne v. United States***, 570 U.S. 1 (2013).  ***See*** Cruz's Brief at 31.   He contends both direct appeal and PCRA counsel were ineffective for failing to raise this claim.

In ***Alleyne***, the United States Supreme Court held "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."  ***Alleyne***, ***supra***, 99 U.S. at 102.  In interpreting that decision, the courts of this Commonwealth have determined that most of our mandatory minimum sentencing statutes, including 42 Pa.C.S. § 9712,[10] are unconstitutional because the language of those statutes "permits the trial court, as opposed to the jury, to increase a defendant's minimum sentence based upon a preponderance of the evidence" standard.  ***Commonwealth v. Newman***, 99 A.3d 86, 98 (Pa. Super. (Pa. Super. 2014) (*en banc*), *appeal denied*, 121 A.3d 496 (Pa. 2015).  ***See Commonwealth v. Valentine***, 101 A3d 801, 812 (Pa. Super. 2014) (invalidating 42 Pa.C.S. §§ 9712 and 9713), *appeal denied*, 124 A.3d 309 (Pa. 2015).  Further, our courts have held that the unconstitutional provisions of

---

considering he filed a pretrial motion seeking to suppress these same statements, and asserted on direct appeal that the statements were obtained in violation of ***Miranda v. Arizona***, 384 U.S. 436 (1966).  ***See*** Omnibus Pretrial Motions, 11/9/2011, at ¶¶ 4-7; Trial Court Opinion, 1/20/2012, at 9-11; ***Cruz***, ***supra***, 107 A.3d 232 (unpublished memorandum at 17-20).

[10] Section 9712 required the court to impose a mandatory minimum sentence if a defendant committed a crime of violence while visibly possessing a firearm.  ***See*** 42 Pa.C.S. § 9712(a).

the mandatory minimum statutes are not severable from the statute as a whole. **Commonwealth v. Hopkins**, 117 A.3d 247, 262 (Pa. 2015); **Newman**, **supra**, 99 A.3d at 101.

The inherent problem with Cruz's argument is the record does not support his claim that he was sentenced pursuant to Section 9712, or any of the now unconstitutional mandatory minimum statutes. Our review of the record, as well as the transcript from the sentencing hearing, reveals no mention of the imposition of a mandatory minimum sentence, nor any prior notice from the Commonwealth that it sought a mandatory minimum term. Accordingly, this claim is meritless.

In his final issue, Cruz contends direct appeal counsel was ineffective for failing to file a petition for allowance of appeal ("PAA") in the Pennsylvania Supreme Court after this Court affirmed his judgment of sentence. Cruz insists direct appeal counsel did not inform him his sentence was affirmed, and by the time Cruz learned of this Court's decision three months later, he was time-barred from seeking review in the Pennsylvania Supreme Court. **See** Cruz's Brief at 33. For the reasons that follow, we reverse the order denying relief on this basis and remand for an evidentiary hearing.

It is well-established that "counsel is *per se* ineffective for failing to file a **requested** petition for allowance of appeal." **Commonwealth v. Rigg**, 84 A.3d 1080, 1087 (Pa. Super. 2014) (emphasis supplied). However, in order to request the filing of a PAA, a defendant must be informed, in a timely manner, that his sentence was affirmed in this Court. Here, Cruz maintains

direct appeal counsel never informed him "his direct appeal was denied which caused him to be time barred." Cruz's Brief at 33. Indeed, he contends he learned of this Court's decision in December of 2014, after he requested a copy of the docket entries for his appeal. *See id.* at 34. By that time, the one-month period for filing a petition for allowance of appeal from this Court's September 22, 2014, decision had expired.

In denying relief, the PCRA court relied on the analysis PCRA counsel provided in his "no merit" letter. *See* Order, 7/25/2016 at 1 n.1. Counsel addressed this claim as follows:

> [A] review of [direct appeal] counsel's file reveals that a letter dated September 29, 2014 was addressed and mailed to you. That letter references enclosing a copy of the Superior Court's decision from September 22, 2014. It further sets forth the reasoning for the Superior Court's decision and your rights concerning filing a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania. Having received no response from you within the timeframe to file a Petition for [] Allowance of an Appeal, appellate counsel took no further action on your behalf.

"No Merit" Letter, 6/21/2016, at unnumbered p. 9. It merits emphasis that PCRA counsel did not indicate that he had spoken to direct appeal counsel about Cruz's claim, nor did he attach a copy of counsel's purported September 29, 2014, letter to his "no merit" letter. Conversely, Cruz insists counsel never informed him that his direct appeal was denied. Faced with these conflicting statements, we are constrained to reverse the PCRA court's denial of this claim and remand for an evidentiary hearing. We decline to deny Cruz's claim based solely on PCRA counsel's interpretation of a letter which is not included in the certified record.

Therefore, we reverse the PCRA court's order denying relief as to Cruz's claim regarding direct appeal counsel's ineffectiveness for failing to file a petition for allowance of appeal in the Supreme Court. Moreover, we direct the PCRA court to appoint new counsel for Cruz[11] and conduct an evidentiary hearing limited to that issue. In all other respects, we affirm the order denying PCRA relief.

Order reversed in part and affirmed in part. Case remanded for appointment of counsel and evidentiary hearing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/18

---

[11] **See** Pa.R.Crim.P. 908(C) (stating that when scheduling a PCRA hearing, "[t]he judge shall permit the defendant to appear in person at the hearing and shall provide the defendant an opportunity to have counsel.").