J-A26005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY GUDINO | : | |
| | : | |
| Appellant | : | No. 787 EDA 2020 |

Appeal from the Judgment of Sentence Entered October 3, 2019
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0001521-2016

BEFORE:   BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED:  FEBRUARY 19, 2021**

Appellant, Anthony Gudino, appeals from the judgment of sentence of an aggregate term of 23½ to 47 years' imprisonment, imposed after he was convicted of one count each of third-degree murder (18 Pa.C.S. § 2502(c)), endangering the welfare of a child ("EWOC") (18 Pa.C.S. § 4303(a)(1)), and recklessly endangering another person ("REAP") (18 Pa.C.S. § 2705). Appellant challenges the sufficiency of the evidence to sustain his convictions, the denial of his request for jury instructions, and the admission of alleged hearsay evidence.  We affirm.

The trial court set forth the relevant procedural history in its Pa.R.A.P. 1925(a) opinion:

> On July 15, 2016, Appellant was charged by criminal information with criminal homicide, [EWOC], and [REAP] in connection with

---

[*] Former Justice specially assigned to the Superior Court.

the death of Appellant's minor daughter, A.G. On July 15, 2019, after trial by jury, Appellant was convicted of third[-]degree murder, [EWOC], and [REAP]. The jury found Appellant not guilty of first[-]degree murder.

On October 3, 2019, we sentenced Appellant to 20 to 40 years' incarceration for third[-]degree murder and 3½ to 7 years' incarceration for [EWOC]. The sentences on each charge were ordered to run consecutively, giving Appellant a total aggregate sentence of 23½ to 47 years' incarceration. No sentence was imposed for [REAP], as that count merged for purposes of sentencing. Appellant received a time credit from May 6, 2016.

Appellant filed post-sentence motions on October 15, 2019, and supplemental motions on December 4, 2019. We denied all of Appellant's post-sentence motions by opinion and order dated February 3, 2020.[1]

Trial Court Opinion ("TCO II"), 4/13/20, at 1-2 (unnecessary capitalization and citations to the record omitted).

On February 21, 2020, Appellant filed a timely notice of appeal, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant presents the following issues for our review, which we address out of order for ease of disposition:

1. Whether the trial court erred in finding [Appellant] guilty of third-degree murder[,] where there was no evidence to support either causation or malice because the Commonwealth showed only that [Appellant] rushed his young child to the hospital where the child died of head injuries caused by as few as two simultaneous contacts with some kind of hard object?

2. Whether the trial court erred in denying [Appellant's] request for an involuntary manslaughter instruction[,] where the Commonwealth introduced no evidence as to how the decedent

_____

[1] The trial court's February 3, 2020 opinion was docketed on February 4, 2020. **See** Trial Court Opinion ("TCO I"), 2/4/20.

- 2 -

sustained her fatal injuries and the forensic pathologist could not rule out an accident?

3. Whether the trial court erred in giving the jury an instruction on the "sole custody" presumption[,] where the Commonwealth could not show that the injuries were neither self-inflicted nor accidental[,] because the forensic pathologist testified that they could have been the result of non-criminal behavior?

4. Whether the trial court erred in finding sufficient evidence to find [Appellant] guilty of [EWOC,] graded as a felony of the third degree[,] where [Appellant] did not engage in a course of conduct but[,] at most[,] caused the decedent's injuries on one occasion as part of one incident?

5. Whether the trial court erred in admitting hearsay testimony from a family friend that [Appellant] would get drunk and fail to properly care for the decedent?

Appellant's Brief at vii-viii.

To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

In reviewing a sufficiency of the evidence claim, we must determine whether the evidenced admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Koch*, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

The trial court found the evidence presented at trial, viewed in the light most favorable to the Commonwealth, established the following:

On May 6, 2016, [Appellant] arrived at the Pocono Medical Center (hereinafter "PMC") with his 5-month-old daughter, A.G., in an unresponsive state. Just prior to arriving at PMC, at

- 3 -

approximately 12:07 p.m., East Stroudsburg University Sergeant Jim Hughes ("Hughes") was approached by [Appellant] carrying A.G. in his arms. [Appellant] informed Hughes [that] A.G. was not breathing right and requested transportation to the hospital.

Hospital staff reported to police that when A.G. arrived[,] she was limp, unresponsive, and was not breathing. Upon arrival, A.G. was considered to be in critical/grave condition. Her injuries included: hemorrhaging of the occipital, right parietal, and left parietal areas of the head, fracture to the occipital area of the skull, one blown pupil[,] and one non-reactive pupil. The hospital staff told officers that these injuries were consistent with blunt force trauma. In addition, hospital staff believed [Appellant] was under the influence of drugs or alcohol, that he had an odor of alcohol about his person, and that he was behaving erratically. Further, hospital staff, "almost immediately suspected child abuse."

Following initial assessment, CT scans revealed multiple areas of brain injury including both old and new bleeding throughout the brain. Efforts were made to reduce the bleeding but were unsuccessful[,] and A.G. never regained consciousness. A.G.'s heart stopped several times during these efforts and arrangements were made for a life flight to Lehigh Valley Hospital. Unfortunately, A.G. passed away while these efforts were underway[,] and the life flight was canceled.

When Detective Richard Wolbert arrived at the hospital, he spoke with [Appellant] twice. During these encounters, [Appellant] reiterated what he had told hospital staff—namely, that he was home alone with A.G.[,] and she was drinking from a bottle in her baby swing when he heard a gurgling sound. [Appellant] stated that when he went to check on A.G.[,] she was limp and unresponsive.

Later in the evening of May 6, 2016, police obtained a search warrant for [Appellant's] blood, the results of which revealed a blood alcohol content of .06%. Additionally, a retrograde extrapolation was performed to estimate [Appellant's] blood alcohol level (hereinafter "BAC") at the time of the incident in question. The retrograde toxicology report indicated [Appellant's] BAC at 11:00 a.m. on May 6, 2016, was in the range of 0.16% to 0.34%. The Commonwealth's technical specialist in toxicology estimated this BAC would result from consuming between 7 and 16 twelve-ounce beers with a 4% alcohol content. In addition,

[Appellant] admitted to smoking marijuana on the morning of the incident in question and his blood tested positive for cannabinoids.

The evidence at trial showed that A.G. suffered at least two fatal blows of significant force to the head while she was in [Appellant's] care. These fatal blows were not the result of a simple slap or strike of the hand; rather, something blunt struck A.G.'s head with significant force. Examples given at trial of blunt objects capable of inflicting A.G.'s injuries included a brick and a bannister. Beyond the fatal blows, A.G. suffered an additional injury characterized by "some moving, angular, and rotational movement of the head with tearing of the vessels around the optic nerve." Although it was conceded that A.G.'s injuries, when viewed in isolation, could have accidental causes, the expert opined that the totality of the injuries here clearly indicated abusive head trauma. A.G.'s injuries were extensive, including large and confluent retinal hemorrhages, "vitreous hemorrhages[,] … optic nerve sheath hemorrhages[,] … subdural hemorrhages with liquid and clotted blood[,] … brain swelling[,] … subarachnoid hemorrhages[,] … and multiple impact sites." As the Commonwealth's expert in forensic pathology, Dr. Barbara Bollinger, noted[:] "You have to look at the whole case together with the whole confluence of the injuries." Here, Dr. Bollinger opined that the confluence of the injuries supported a finding of abusive head trauma.

TCO I at 4-6 (citations to record and internal brackets omitted).

Appellant's first issue challenges the sufficiency of the evidence to support his third-degree murder conviction. The Crimes Code defines third-degree murder as "[a]ll … kinds of murder" other than intentional killings (first-degree murder) and killings during the commission of a felony (second-degree murder). 18 Pa.C.S. § 2502(c). The elements of third-degree murder, as developed by case law, are "a killing done with legal malice but without the specific intent to kill required in first-degree murder." **Commonwealth v. Seibert**, 622 A.2d 361, 364 (Pa. Super. 1993).

Appellant claims that the trial court erred in convicting him of third-degree murder, because the Commonwealth failed to prove that he acted with malice or that he caused A.G.'s death. Appellant's Brief at 1. Rather, he argues that the Commonwealth obtained a conviction based solely on evidence that A.G. was in his custody at the time she suffered the injuries to her head. *Id.* at 4. "It did not show how those injuries occurred or any evidence establishing that [Appellant] inflicted them on her." *Id.* Appellant further proffers: "Accidents happen. Children fall, people drop things, and injuries tragically occur. The Commonwealth's evidence failed to establish that this was anything more than some kind of accident." *Id.* at 4-5.

Appellant further argues that even if the Commonwealth did prove causation based on the sole custody presumption, it failed to prove the requisite *mens rea* for third-degree murder, which is malice. *Id.* at 1, 5. He states that "no one knows what happened[] and[,] therefore[,] it is simply not possible to determine under what mental state [Appellant] acted…." *Id.* at 6. He further reasons,

> [g]iven that Dr. Bollinger opined that force being used on [A.G.,] or [A.G.] hitting her head were both possibilities, there is no evidence in the record from which to conclude beyond a reasonable doubt that [Appellant] struck her in the head with a hard object.[2] The fact that he could not provide a satisfactory

---

[2] We disagree with Appellant's characterization of Dr. Bollinger's testimony. While she did state that the blunt force injuries to A.G.'s head were either caused by something blunt hitting against her head or her head hitting something blunt, Dr. Bollinger also emphasized the severity of A.G.'s injuries

- 6 -

explanation, likely due to his intoxicated state, does not establish the requisite *mens rea* of malice.

***Id.*** Thus, Appellant concludes "[t]here is no evidence in this record which would support a conviction for third-degree murder." ***Id.*** at 7.

In response to Appellant's sufficiency claims regarding his third-degree murder conviction, the trial court opined:

> The elements of [t]hird[-][d]egree [m]urder are as follows: (1) that the victim, A.G., is dead; (2) that [Appellant] killed her; and (3) that [Appellant] did so with malice.
>
> First, we note there is no dispute that A.G. is deceased. Looking then to the question of causation, it is well-established that []a defendant's actions are the legal cause of death if they are a direct and substantial factor in bringing it about.[] ***Commonwealth v. Johnson***, 284 A.2d 734[, 735] (Pa. 1971). Here, [Appellant] argues the evidence was insufficient to connect his actions with A.G.'s head injury and resulting death. However, … "the Commonwealth need not prove its case directly. Circumstantial evidence can be as reliable and persuasive as eyewitness testimony." ***Commonwealth v. Paquette***, 301 A.2d 837, 839

---

and the likelihood of these particular injuries being the result of abusive trauma. ***See*** N.T. Trial, 7/10/19, at 120-21 (stating that the combination of the retinal hemorrhages, damage to the retina of the eye, and the optic nerve sheath hemorrhage "implies significant trauma to the brain, and generally that trauma occurs from a shaking mechanism with lateral and rotational, angular acceleration"); ***id.*** at 122 (explaining that the triad of injuries to A.G.'s brain—optic nerve sheath hemorrhage, retinal hemorrhage, and subdural hemorrhage—are indicative of "abusive trauma"); ***id.*** at 128-29 ("I believe there were at least two blows to the head…. They were both to the forehead."); ***id.*** at 140 (Dr. Bollinger's explaining the type of evidence that signifies a traumatic injury: "[A.G.] had bruising to the forehead, bruising underneath the forehead, subdural hemorrhage, subarachnoid hemorrhage, optic nerve sheath hemorrhages, and retinal hemorrhages, so there's a lot of trauma and traumatic injuries that are occurring here"); ***id.*** at 145 ("What I do know is that [A.G.] has optic nerve sheath hemorrhages, and those optic nerve sheath hemorrhages are markers of extreme rotational and angular acceleration of the head.").

(Pa. 1973) (citing **Commonwealth v. New**, 47 A.2d 450, [4]57 (Pa. 1946)).

Where, as here, "an adult has sole custody of a child for a period of time, and[] during that time the child suffers wounds which unquestionably are neither self-inflicted nor accidental, the evidence is sufficient to allow a jury to infer the adult inflicted the wounds." **Pacquette**, 301 A.2d at 839; **see also Commonwealth v. Turner**, 421 A.2d 1057, 1060 (Pa. 1980). Thus, courts created the "[s]ole [c]ustody" exception to establish "an inference of guilt where a child suffers a fatal injury while an adult has sole custody of the child." **Commonwealth v. Earnest**, 563 A.2d 158, 160 (Pa. Super. 1989).

Here, [Appellant] had sole custody of the minor victim when the child suffered wounds that were neither self-inflicted nor accidental. Based on the evidence we delineated above, the jury could reasonably infer [Appellant] caused the fatal injuries to A.G.[3]

We now move to the element of malice. Malice consists of, "either an express intent to kill or inflict great bodily harm … indicating an unjustified disregard for the probability of death or great bodily harm and an extreme indifference to the value of human life." **Commonwealth v. Lawrence**, 236 A.2d 768, 771 (Pa. 1968). Malice can be inferred from the surrounding circumstances, such as the use of a deadly weapon or force on a vital part of the body of another. **Commonwealth v. Oates**, 295 A.2d 337, 339 (Pa. 1972); **see also Commonwealth v. Palmer**, 292 A.2d 921, 923

---

[3] While applying the sole custody presumption set forth in **Paquette**, our Supreme Court has held that the finder of fact may examine any explanation offered by the sole caregiver, and if they find that explanation wanting, they may reject it and find the person in custody of the child responsible for the wounds. **Commonwealth v. Meredith**, 416 A.2d 481, 482-83 (Pa. 1980) (citing **Paquette**, 301 A.2d at 837). Moreover, conflicts between the medical findings and the appellant's version of the incident have been found to provide the jury with an adequate basis for rejecting the defense's explanation of the source of the injuries sustained by the victim. **See id.** at 483-84. Thus, we believe the jury would be justified here in rejecting Appellant's theory that A.G.'s injuries were the result of an accident, where the only possible explanations for A.G.'s injuries offered by Appellant have been refuted by expert medical testimony. **See** TCO I at 20, *discussed infra*.

(Pa. 1972). In a case involving a minor child, the *mens rea* necessary to establish the degree of homicide "may be proven by circumstantial evidence. The nature and severity of the blows, [and] the tender age of the victim … would support … a finding of malicious killing." … **Meredith**, 416 A.2d [at] 48[4]….

Here, the evidence showed that deadly force was applied to a vital part of the body of the victim. Examining the number and severity of the blows inflicted, the areas of the body where the blows were administered, and the size and tender years of the victim, the jury was free to infer that [Appellant] intended to cause the death that resulted from his actions. **See** [**id.**] … at 483. Thus, a finding of malice was justified. As a result, the evidence, viewed in the light most favorable to the Commonwealth, establishes, beyond a reasonable doubt, that [Appellant] committed the crime of [t]hird[-d]egree [m]urder.

TCO I at 7-8 (citations to record omitted). We discern no abuse of discretion or error of law by the trial court.

Next, Appellant challenges the sufficiency of the evidence to support his EWOC conviction. In order to prove a defendant committed the offense of EWOC,

the Commonwealth must show, beyond a reasonable doubt, that the defendant "knowingly endanger[ed] the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.[] § 4304(a)(1). In addition, if the actor engaged in a course of conduct of endangering the welfare of a child, the offense constitutes a felony of the third degree. **See** [18 Pa.C.S.] § 4304(b)(ii).

[EWOC] is a specific intent offense enacted in broad terms[,] so as to safeguard the welfare and security of children. **Commonwealth v. Fewell**, 654 A.2d 1109, 1117 (Pa. Super. 1995). To be convicted under this statute, the Commonwealth must prove a "knowing violation of a duty of care." **Commonwealth v. Cardwell**, 515 A.2d 311, 313 (Pa. Super. 1986). The evidence is sufficient to prove the intent element of the offense when the accused:

> (1) is aware of his or her duty to protect the child; (2) is aware that the child is in circumstances that threaten the child's physical or psychological welfare; and (3) has either failed to act or has taken actions so lame and meager that such actions cannot reasonably be expected to be effective to protect the child's physical or psychological welfare.

> *Id.* at 315. In addition, the legislative language for "course of conduct" is designed "to punish a parent who over days, weeks, or months, abuses his children." *Commonwealth v. Popow*, 844 A.2d 13, 17 (Pa. Super. 2004).

*Id.* at 8-9. Moreover, in *Commonwealth v. Taylor*, 471 A.2d 1228 (Pa. Super. 1984), we discussed the legislature's intent in enacting section 4304 and its broad purpose:

> [Our] Supreme Court has said that section 4304 was drawn broadly to cover a wide range of conduct in order to safeguard the welfare and security of children. It is to be given meaning by reference to the common sense of the community and the broad protective purposes for which it was enacted. *Commonwealth v. Mack*, 359 A.2d 770, 772 (Pa. 1976). Thus, the "common sense of the community, as well as the sense of decency, propriety[,] and the morality which most people entertain is sufficient to apply the statute to each particular case, and to individuate what particular conduct is rendered criminal by it." *Id.*

*Id.* at 1231 (some internal brackets and citations omitted).

Instantly, Appellant's challenge is limited to the trial court's gradation of his EWOC offense as a felony of the third degree. Appellant's Brief at 15. Appellant notes that "a course of conduct" is required to grade this crime as such, and argues that the Commonwealth only demonstrated "that fatal injuries occurred to [A.G.] while she was in [his] custody on one occasion."

- 10 -

*Id.* (citing 18 Pa.C.S. § 4304).[4] He further asserts that section 4304 of the Crimes Code does not impose an increased punishment for "one incident based on … subsection [(b)(1)(ii),] no matter how serious the incident," and that "the Commonwealth could have charged other subsections that did[,[5]] but [it] chose not to do so." *Id.* at 16. Thus, Appellant demands that we vacate his judgment of sentence on this offense and remand for re-sentencing.

In support of Appellant's EWOC conviction, the trial court opined:

[A]s the sole caretaker of his infant daughter, [Appellant] was aware of his duty to protect [A.G.] Further, … [Appellant] had sole custody of A.G. when [she] suffered blunt force trauma wounds that were neither self-inflicted nor accidental. In light of the evidence delineated above, [Appellant] failed to protect A.G.'s

---

[4] In support of his argument, Appellant cites *Popow*, in which the defendant's conviction arose out of an incident that occurred on one single night, and notes that this Court determined there was no "course of conduct." *See id.* (citing *Popow*, 844 A.2d at 16). We deem *Popow* to be distinguishable from the instant matter, however, as *Popow* involved only one potential endangering act or condition—Popow's engaging in a scuffle while holding his child in his arms, which caused them both to fall down a flight of stairs. *See Popow*, 844 A.2d at 15. We declined to upgrade the event to a "course of conduct" in *Popow*, as the incident "probably took place in a matter of minutes[,]" no evidence was presented at trial to establish a course of conduct, and because the jury charge did not include the additional "course of conduct" factor required for the grading of EWOC as a third-degree felony. *Id.* at 17-18. As discussed by the trial court, *infra*, the Commonwealth did present evidence in the instant matter of Appellant's exhibiting a pattern of abusive actions over a course of time, and the jury charge included instructions on the "course of conduct" element.

[5] Based on our review of section 4304, we presume Appellant is referring to subsection (b)(1)(iii), which provides "if, in the commission of the offense under subsection (a)(1), the actor created a substantial risk of death or serious bodily injury, the offense constitutes a felony of the third degree." 18 Pa.C.S. § 4304(b)(1)(iii).

physical welfare and clearly violated his duty of care, protection, and support.

Examining the course of conduct, we find the jury made reasonable inferences based on the evidence that [Appellant] exhibited a pattern of abusive actions over the course of time. First, testimony supported finding [Appellant] was intoxicated and using drugs while in the position of caretaker for the minor [v]ictim on more than one occasion. Second, as discussed above, [Appellant] was intoxicated while caring for the minor victim at the time of the incident in question.[6] For these reasons, the above evidence, viewed in the light most favorable to the Commonwealth, establishes beyond a reasonable doubt, that [Appellant] committed the crime of [EWOC]—course of conduct.

TCO I at 9-10 (citations to record and unnecessary capitalization omitted).

Discerning no abuse of discretion or error of law on the part of the trial court, we conclude that Appellant's conviction must stand.

We next consider Appellant's claims regarding the trial court's denial of his request for an involuntary manslaughter jury instruction, and its alleged error in giving the jury an instruction on the "sole custody" presumption. Our standard of review in regards to a trial court's decisions on jury instructions is well-settled:

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." **Commonwealth v. Galvin**, … 985 A.2d 783, 788-89 ([Pa.] 2009). "[O]ur key inquiry is whether the instruction on a particular issue adequately, accurately[,] and clearly presents the law to the jury, and is sufficient to guide the jury in

---

[6] The Commonwealth notes that the "relation-back analysis" of Appellant's BAC indicated not only that he was intoxicated on May 6, 2016, at the time A.G. suffered multiple traumatic and fatal injuries, but also that he "would have been … intoxicated for a course of hours…." Commonwealth's Brief at 21.

- 12 -

its deliberations." ***Commonwealth v. Hamilton***, 766 A.2d 874, 878 (Pa. Super. 2001).

***Commonwealth v. Cannavo***, 199 A.3d 1282, 1286 (Pa. Super. 2018).

Appellant argues that the trial court erred in denying his request for an instruction on involuntary manslaughter.  He notes that defense counsel specifically requested such an instruction and preserved the issue by objecting both before and after the charge.  Appellant's Brief at 8.  In support of his claim, Appellant asserts there is a three-part inquiry to determine whether a charge on involuntary manslaughter is warranted:  "First, a criminal defendant must make such a request.  Second, the offense must have been made an issue in the case.  Third, the evidence must support such a charge." ***Id.*** (citing ***Commonwealth v. McCloskey***, 656 A.2d 1369, 1372 (Pa. Super. 1995)).

Appellant proffers:

The defense made the request, and the evidence in this case supported a charge for involuntary manslaughter.  Pursuant to 18 Pa.C.S. § 2504, a person is guilty of involuntary manslaughter "when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person."

…

Here, the evidence obviously supported an involuntary manslaughter charge for many of the reasons that the evidence was insufficient to support the third-degree murder verdict.  The Commonwealth showed that [A.G.] arrived at the hospital with unexplained head trauma that was caused by coming into contact with a hard object of some kind at least twice.  The Commonwealth could not establish what the object was, the circumstances under which that contact took place, or even that the contacts must have been two separate impacts as opposed to simultaneous impacts.  Whether the trial court believed it or not, other testimony and statements from defense witnesses

- 13 -

suggested that the decedent may have banged her head on a wall, on a swing, or on a car door on prior occasions.

*Id.* at 8-9. Appellant further suggests that the evidence at least supported the possibility that he had done something with gross negligence or recklessness while intoxicated that caused A.G.'s death. *Id.* at 10.

Contrarily, the Commonwealth poses that Appellant is not entitled to a particular jury instruction simply because he has requested it. Commonwealth's Brief at 10. "[A] trial court should not instruct the jury on legal principles which have no application to the facts presented at trial." *Id.* at 11 (quoting *Commonwealth v. White*, 415 A.2d 399, 400 (Pa. 1980)). The Commonwealth explains the reason for this rule is that, "instructing the jury on legal principles that cannot rationally be applied to the facts presented at trial may confuse them and place obstacles in the path of a just verdict." *Id.* (quoting *White*, 415 A.2d at 400). It maintains that Appellant was clearly *not* entitled to a jury instruction for involuntary manslaughter, "as there … [was] no trial evidence to 'reasonably support' such a verdict." *Id.* at 14. The Commonwealth adds:

> [T]he only accounts provided for what caused the fatal injuries to A.G. stand in stark contrast to the medical evidence and testimony presented at trial. All accounts provided by [Appellant] or on his behalf involve either no traumatic event, an impact to the back of A.G.'s head, or a single impact to the front of [A.G.'s] head days before. These claims are emphatically refuted by the uncontroverted medical evidence.
>
> Moreover, even if the above-referenced accounts are to be believed, they would rise only to the level of mere accidents at best…. Involuntary manslaughter requires an act that is either reckless or grossly negligent. A simple accident is insufficient to satisfy the *mens rea* required for the offense. There is no evidence

- 14 -

that suggests that [Appellant] acted by consciously disregarding a substantial and unjustifiable risk. As such, these accounts of mere accidents on the part of [Appellant] or his wife,[7] even if believed, would not "reasonably support" a verdict for involuntary manslaughter.

*Id.* at 14-15.

The trial court agreed with the Commonwealth. As it so aptly opined:

When a defendant requests specific points for charge, the court does not err in refusing to read the requested points if said points are "either adequately and correctly covered elsewhere in the court's charge or were not relevant to the issues presented in the case." **Commonwealth v. Griffin**, 456 A.2d 171, 176 (Pa. Super. 1983). A charge on involuntary manslaughter "shall be given only when requested, and where the offense has been made an issue in the case *and the trial evidence reasonably would support such a verdict*." … **White**, 415 A.2d [at] 402 … (emphasis added). Moreover, when he requests an instruction like involuntary manslaughter, it is well-settled that "*a criminal defendant* must establish that the trial evidence would 'reasonably support' a verdict based on the desired charge and may not claim entitlement to an instruction that has no basis in the evidence presented at trial." **Commonwealth v. Taylor**, 876 A.2d 916, 925-26 (Pa. 2006) (emphasis added). "Nor can the involuntary manslaughter charge be justified as giving a jury discretion to dispense mercy, since it is in the realm of arbitrariness to convict one of the misdemeanor of involuntary manslaughter when all evidence rationally indicates felonious homicide." **Commonwealth v. Williams**, 415 A.2d 403, 405 (Pa. 1980). "[T]here must be some relationship between the evidence presented and the law upon which an instruction is requested." **Taylor**, 876 A.2d at 925. Evidence that a defendant acted without malice or intent is *insufficient* to warrant a jury instruction on involuntary manslaughter. **Commonwealth v. Soltis**, 687 A.2d 1139, 1141-42 (Pa. Super. 1996). In order for an instruction on involuntary manslaughter to be justified, there must be some evidence of recklessness or gross negligence. **Id.**

---

[7] Appellant's wife testified that she had hit A.G.'s head on the side of a car, approximately four days prior to A.G.'s death. TCO I at 20.

The facts in evidence at trial do not reasonably support a finding of involuntary manslaughter. As we delineated above, the evidence at trial showed that A.G. suffered at least two fatal blows to the head while she was in [Appellant's] care. When [Appellant] brought A.G. to the emergency room[,] she was unresponsive and bruises were just forming on the front upper portion of her head. Further, the forensic evidence showed that A.G.'s cause of death was blunt force injuries to the head. Moreover, despite [Appellant's] incorrect summation of Dr. Bollinger's testimony, Dr. Bollinger did *not* surmise that the specific injuries to A.G. could have been the result of an accident. Indeed, the force with which a blunt object would have had to hit A.G.'s head, or the force with which A.G.'s head would have had to hit a stationary item, was considerable.

We understand that [Appellant] presented the theory at trial that he may have placed A.G. in her swing in a rough manner[;] however, Dr. Bollinger's testimony as to the force with which A.G.'s head had to have been hit in order to cause her fatal injuries wholly negated [his] theory. Further, we understand that [Appellant] advances the theory that several days earlier, he hit A.G.'s head on the wall while trying to separate his dogs[,] and that his wife, Jasmine Gudino, testified that approximately four days prior to A.G.'s death, she hit A.G.'s head on the side of a car. However, Dr. Bollinger's testimony also negates the theory of injuries caused days in advance of A.G.'s death. Specifically, had these earlier instances of striking A.G.'s head been the cause of her fatal injuries, she would have been exhibiting signs of distress and injury leading up to the state in which [Appellant] delivered her to the emergency room.

Lastly, we note that all three theories advanced by [Appellant] to explain A.G.'s fatal injuries would fall into the category of pure accident, as opposed to recklessness or gross negligence, which, as we have previously held, and as the Superior Court has previously affirmed, is not sufficient to withstand criminal charges. ***See Commonwealth v. Wyatt***, 203 A.3d 1115, 1119 (Pa. Super. 2019). As noted above, evidence that a defendant acted without malice or intent does not necessarily warrant an instruction on involuntary manslaughter—a defendant must establish that the trial evidence would reasonably support a finding of recklessness or gross negligence. ***See Taylor***, 876 A.2d at 925-26; ***Soltis***, 687 A.2d [at] 1141-42.

> Based on the foregoing, there was no evidence presented that tended to show … A.G.'s death was the result of an accident caused by [Appellant], and there was no evidence presented that tended to show [Appellant] acted with recklessness or with gross negligence in causing the death of A.G. Thus, this court did not err in refusing to charge the jury on involuntary manslaughter as a potential verdict.

TCO I at 18-21 (unnecessary capitalization and citations to record omitted).

Appellant has failed to convince us that the trial court erred in its refusal to give an involuntary manslaughter instruction.

Regarding the "sole custody" instruction given to the jury, Appellant objects to the following language:

> If you find that [Appellant] had sole custody of the child for a period of time, and[] you find that during the time the child suffers wounds which are neither self-inflicted nor accidental, you may find the evidence sufficient to infer that [Appellant] inflicted the wounds.

> That is something in the law we call a presumptive inference. So if you find that he had sole custody for the period of time, and if you find that it was during that period of time that the child suffered wounds that neither were self-inflicted or accidental, then you may find the evidence sufficient to infer [Appellant] inflicted the wounds.

*Id.* at 26 (quoting N.T. Trial, 7/15/19, at 159). Appellant claims the trial court erred in giving this instruction, because the Commonwealth failed to prove that A.G.'s injuries were neither self-inflicted nor accidental. Appellant's Brief at 14. "No one saw [Appellant] harm [A.G.], he did not admit to harming [A.G.], and there was nothing about the injuries which made it impossible for them to have occurred as the result of an accident." *Id.*

The trial court responded to Appellant's claim, in relevant part, as follows:

> The law in Pennsylvania on this issue is well-settled. "Where … an adult has sole custody of a child for a period of time, and[] during that time the child suffers wounds which unquestionably are neither self-inflicted nor accidental, the evidence is sufficient to allow a jury to infer the adult inflicted the wounds." … *Pacquette*, 301 A.2d [at] 839 …; *see also* … *Turner*, 421 A.2d [at] 1060 …; *Meredith*, 416 A.2d at 482. This inference is a logical extension of the principle that, "causation need not be established by direct evidence but may follow from circumstantial evidence of a reliable and persuasive nature." [*Commonwealth v.*] *Matthews*, 389 A.2d [71,] 73 [(Pa. 1978)]. Specifically, courts created the "sole custody" instruction to establish "an inference of guilt where a child suffers a fatal injury while an adult has sole custody of the child." … *Earnest*, 563 A.2d [at] 160…. As previously discussed, a jury instruction is warranted where it is relevant to the issues presented in the case. *Griffin*, 456 A.2d at 176.
>
> Here, the Commonwealth's evidence showed that A.G. was in [Appellant's] sole custody on the day of her fatal injuries, May 6, 2016. The evidence presented also showed that on the morning of May 6, A.G. was in good health, as Linda Clare observed A.G. that morning when [Appellant] dropped his minor son, A.J., off at school. The evidence further showed that between the time of Ms. Clare['s] observing A.G. at A.J.'s school, and the time [Appellant] took A.G. to the emergency room, no other adult had custody of A.G.

TCO I at 27-28 (unnecessary capitalization and citations to the record omitted). We discern no error by the trial court, and we deem its jury instruction regarding "sole custody" to be appropriate.

Lastly, Appellant avers that the trial court erred in "allowing [Officer Eilber] to testify that a family friend[, Mr. Collado,] had arrived at the hospital and told him that [Appellant] was an alcoholic who failed to properly care for [A.G.] and must have caused the injuries." Appellant's Brief at 16. He

maintains that this testimony should not have been allowed as an excited utterance, "because Mr. Collado had not actually seen what happened to A.G.[,] and the statement regarding prior, unrelated incidents served only to smear [Appellant's] character." *Id.*[8]

When reviewing a challenge to the admissibility of evidence, we note that,

> "[t]he admissibility of evidence rests within the sound discretion of the trial court, and such a decision will be reversed only upon a showing that the trial court abused its discretion." *Commonwealth v. Boczkowski*, … 846 A.2d 75, 93 ([Pa.] 2004). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Carter*, … 861 A.2d 957 ([Pa. Super.] 2004) (*en banc*).

*Commonwealth v. Gray*, 867 A.2d 560, 569–70 (Pa. Super. 2005).

Moreover, in determining whether an out-of-court statement is admissible, we are mindful of the following:

> "Hearsay is defined as 'a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Commonwealth v. Cunningham*, 805 A.2d 566, 572 (Pa. Super. 2002) … [(]citing Pa.R.E. 801(c)[)]. "Hearsay testimony is *per se* inadmissible in this Commonwealth, except as provided in the Pennsylvania Rules of Evidence[,] by other rules prescribed by the Pennsylvania Supreme Court, or by statute." *Id.*

\*\*\*

---

[8] The trial court notes that it heard oral argument at sidebar on this issue at the time of trial, and it ruled that Mr. Collado's hearsay statements fit within the excited utterance exception. TCO II at 7.

- 19 -

Rule 803(2) of the Pennsylvania Rules of Evidence permits the admission of an excited utterance as an exception to the general rule that hearsay evidence is inadmissible. The Rule defines an excited utterance as: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event."

*Id.* at 570.

According to Pennsylvania case law,

[f]or a hearsay statement to qualify as an excited utterance, the statement must be a spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.

*Commonwealth v. Upshur*, 764 A.2d 69, 75 (Pa. Super. 2000) (citations and quotations omitted). "[T]here is no clear-cut rule as to the time sequence required for a statement to qualify as an excited utterance, but rather [a] fact-specific determination is to be made on a case-by-case basis." *Gray*, 867 A.2d at 570 (citing *Commonwealth v. Pronksokie*, 383 A.2d 858, 862-63 (Pa. 1978)). "[T]he crucial question, regardless of time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance. It is the spontaneity of … an excited utterance that is the source of reliability and the touchstone of admissibility." *Id.* at 570-71 (internal citations and brackets omitted).

Appellant contends that Mr. Collado's statement did not meet any of the requirements for an excited utterance. Appellant's Brief at 18. He argues that "[i]t was not made close in time or near in location to the events that he recounted, and Mr. Collado did not claim to even witness the events that were actually in question at the trial." *Id.* Additionally, Appellant avers that he suffered prejudice from the trial court's error in admitting this testimony. Specifically, he claims he was prejudiced, "because his reputation was smeared and he was cast as a drunk and neglectful father without any actual evidence or opportunity to challenge the testimony of that witness." *Id.*

In response, the trial court opined:

Regarding the statement at issue here, there was foundation laid by the Commonwealth's questions that at the time Mr. Collado made the statements, he was at the hospital and had been informed of A.G.'s condition and that he was visibly upset about what had happened to her. Mr. Collado was also yelling at this time, so much so that Officer Eilber initially approached Mr. Collado to try to calm him down. Moreover, Mr. Collado was a close family friend of A.G.'s family and had lived with Appellant, A.G., and the rest of their family at some point in time.

Here, Mr. Collado's statements fit squarely within the excited utterance exception[,] and we did not err in allowing the officer to testify to the hearsay. Specifically, Mr. Collado had just found out that A.G., a young child that he was close to and had lived with, had been severely injured while in the care of her father and was now in critical condition. Moreover, his statements were directly related to "some phase of that occurrence which he perceived" in that he immediately and excitedly began yelling that Appellant often did drugs and drank alcohol while he was caring for his children alone, that Appellant should not have been doing such things, and that he believed it was this behavior that led to A.G.'s current condition.

TCO II at 7-8 (citations to the record omitted). Given the close relationship between Mr. Collado and A.G.'s family, we have no difficulty finding that his statements at the hospital, upon learning of her death, were spontaneous declarations made while experiencing overpowering emotion caused by a shocking event. Thus, we conclude that the trial court did not abuse its discretion by admitting them as excited utterances.

Accordingly, we uphold Appellant's convictions.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/21